**UNITED STATES v. JOHNSON.**

**SAME v. SOMMERS et al.**

Nos. 7500, 7501.

Circuit Court of Appeals, Seventh Circuit.

May 2, 1945.

Homer Cummings and William J. Dempsey, both of Washington, D. C., and Harold R. Schradzke, of Chicago, Ill., for appellants.

J. Albert Woll and Earle C. Hurley, U. S. Attorney, both of Chicago, Ill., for appellee.

Before SPARKS, MAJOR and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

On October 23, 1940, the District Court entered judgment against the defendants upon a jury's verdict which had found them guilty of income tax evasions for the years 1936 through 1939. The defendants appealed to this court, which reversed the conviction. United States v. Johnson, 7 Cir., 123 F.2d 111. The Supreme Court granted certiorari and reversed this court. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546.

Before the mandate of the Supreme Court issued, the defendants filed in that court a motion for a stay of mandate until they could take such steps in this court pursuant to Rule 2(3) of the Criminal Appeals Rules, 18 U.S.C.A., following section 688, as were necessary to have the case remanded to the District Court for the purpose of permitting the defendants to file a motion for a new trial on the ground of newly discovered evidence. Upon a motion of the defendants filed in this court, we remanded the case to the District Court to consider and dispose of any motion filed under Rule 2(3) of the Criminal Appeals Rules and any motion collateral thereto, and authorized the District Court to assume jurisdiction of the causes for such purposes.

The District Court assumed jurisdiction and permitted the defendants to file their motion for a new trial on the ground of newly discovered evidence, together with supporting affidavits and papers; and the government was given time to respond. The so-called newly discovered evidence was directed to showing that one of the government's chief witnesses, William Goldstein, had testified falsely on the original trial of the defendants. When the various pleadings had been filed, a hearing was had, and the District Court overruled the motion. From that order denying their motion for a new trial on the ground of newly discovered evidence, the defendants appealed to this court, which affirmed the District Court. United States v. Johnson, 7 Cir., 142 F.2d 588. The defendants then petitioned the Supreme Court for certiorari.

While their petition for certiorari was pending in the Supreme Court, the defendants asked that court to consider some additional information which they contended proved conclusively that William Goldstein had testified falsely on the original trial. The Supreme Court refused to consider these new facts, because they were no part of the record, but did agree to withhold consideration of the petition for certiorari until the defendants could apply to this court for leave to reopen the proceedings on the motion for a new trial so as to present this new information.

The defendants applied to this court to reopen the proceedings on their former motion for a new trial. On November 16, 1944, this application was granted. We vacated our former order which had affirmed the District Court's denial of the defendants' original motion for a new trial on the ground of newly discovered evidence and again remanded the case to the District Court, this time with directions to consider and dispose of the defendants' amended motion and to certify its ruling back to this court at an early date.

Upon the filing of the certified copy of our order of November 16, 1944, the District Court on its own motion ordered the defendants to file on or before December 4, 1944, their motion and supporting papers as authorized by our order, and further ordered that the United States should respond thereto on or before December 7, 1944. December 11, 1944 was set as the date for the defendants' reply and for oral arguments on the motion. Motion, response and reply were filed, a hearing had, and on December 15, 1944, the District Court in a memorandum opinion overruled the amended motion for a new trial on the ground of newly discovered evidence and entered judgment accordingly. The defendants' present appeal is from that judgment.

The original motion alleged that William Goldstein testified falsely at the trial in relation to the ownership of ten items of property, referred to as the "Bon Air," the "Curran Farm," the "Green House," the "White House," the "Gas Station," the "Dells property," "9730 Western Avenue property," the "$10,000 Escrow," the "$7,500 Escrow," and the "Albany Park Bank Building." The proof offered in support

of the original motion had to do with all of these ten pieces of property, while the additional proof offered in connection with the amended motion had to do only with the "Albany Park Bank Building."

That Goldstein's testimony was material and, if false, was highly prejudicial to the defendants, is not in dispute. The falsity of Goldstein's testimony was the essential issue presented and decided by the court below, both on the original and on the amended motion, and the correctness of those decisions is the only issue presented to this court. As stated in the government's brief filed in this court on the original motion: "It seems obvious therefore that the finding by the District Court that Goldstein did not testify falsely completely and effectively disposed of all purported justification for a new trial, and his order and the appeal therefrom presents to this Court only a question of fact, namely, did Goldstein testify falsely at the trial?"

And again it is stated in the same brief: "In short, the question presented by the defendants in the court below was: Did Goldstein tell the truth when he testified in the trial of this case? An examination of the defendants' brief discloses that basically this same question is the sole question presented to this Court. After considering all of the affidavits introduced in support of the defendants' motion for a new trial Judge Barnes found that Goldstein did tell the truth. It is patent that such a finding is a finding of fact."

In discussing the proof bearing upon the issue of falsity, it is important to have in mind the circumstances under which Goldstein testified as a government witness. It appears that the Grand Jury was engaged in an investigation of the income of the defendant Johnson and of one William Skidmore. Goldstein, who was a personal friend as well as the attorney for Skidmore, testified before the Grand Jury. In an effort to protect Skidmore, he gave certain testimony which resulted in his indictment for perjury. He and Skidmore were also indicted as co-defendants with Johnson in the instant case. On the day the case was called for trial, the charge against Goldstein and Skidmore was dismissed, and shortly thereafter Goldstein took the witness stand for the government and gave the testimony now alleged to be false. He denied on the witness stand that he had been promised immunity, but stated, "My lawyer has not told me anything about what the deal was." After the perjury indictment was returned, he furnished bond but after the trial in the instant case was released upon his own recognizance. The perjury indictment has not been tried and so far as this record discloses is still pending. Furthermore, it is shown by affidavit that in the summer of 1942 a complaint was filed with the Chicago Bar Association, the designated agent of the Supreme Court of Illinois for the determination of misconduct of attorneys. With reference to this complaint, William J. Dempsey, of counsel for Johnson, in a letter to the Attorney General under date of June 25, 1943, stated: "The complaint requested that an investigation be made of Goldstein's perjury and that appropriate action be taken. When Mr. Woll (United States District Attorney) learned that such an investigation was to be undertaken, he saw fit to request the Bar Association to defer any investigation of this matter until after the United States Supreme Court had decided the Johnson case. This investigation was deferred again at Mr. Woll's request after the Supreme Court's decision of June 7, 1943."

This statement is not denied either by the United States Attorney or by any official of the Chicago Bar Association.

All of the proof in support of and in opposition to the motion and the amended motion is in the form of affidavits and documents. Much of it, as far as we can ascertain, is immaterial to the issue. In our consideration, we shall attempt to confine our discussion to that which we think is relevant. We shall first consider the testimony of Goldstein with reference to the "Albany Park Bank Building" for the reason that all of the proof offered in support of the amended motion concerns Goldstein's testimony relative to this property. In our opinion, the government makes an ill advised attempt to escape defendants' contention that Goldstein testified that Johnson was the owner of the properties in question but embraced nothing more than the bare fact that in the purchase of the various properties involved the money for such purchases was received from Johnson. Especially is this true in light of the fact that the cornerstone of the government's case was that Johnson was the owner. Based largely on Goldstein's testimony, the government has succeeded in convincing the jury and court after court that such was the case.

Concerning the Albany Park Bank Building, Goldstein testified: "I was requested by Mr. Johnson to go out there and purchase the (Albany Park Bank) building for him. * * I purchased that property at the request of Mr. Johnson. * * Title to that property was taken in the name of Ted W. Goldstein, my son. Subsequently there was a quit claim deed delivered to Mr. William R. Johnson by my son. This Albany Park Building property was purchased July 16, 1937."

The court below accurately paraphrased this testimony as follows: "Goldstein testified on the trial that he purchased this property for Johnson and paid for it with currency given him by Johnson; that he took title in the name of his son Ted Goldstein, and subsequently caused a quit claim deed to be delivered to Johnson."

It is difficult to discern how Goldstein could have any more definitely placed the ownership of this property in Johnson. That the government squarely relied upon this testimony as proving ownership in Johnson is shown in its brief on reargument before the Supreme Court, wherein it cites Goldstein's testimony alone for the following statement: "Johnson was shown to be the owner of the building" (referring to the Albany Park Bank Building).

At least two of the affidavits refer to Goldstein's perjury generally, as distinguished from that with reference to any particular property, and we shall first consider these affidavits and briefly state the reason they were cast aside by the trial court. Maurice Green, who for many years had been a personal friend of Goldstein, makes two affidavits. In the first he states that he was told by Goldstein, "his testimony regarding purchases of properties for said William R. Johnson was false." Goldstein told the affiant "that he had to so testify to help himself because of charges of contempt, conspiracy and perjury pending against him and to help Skidmore." Affiant discussed with Goldstein the making of an affidavit telling the truth and Goldstein stated "that he would like to, but that if he did he would certainly be disbarred." In the second affidavit, Green states that when he left his place of employment, i. e., Schwefer's Bakery, Goldstein was waiting for him and the following colloquy took place:

" 'Maurice, I didn't think that you would go out of your way to hurt me.' That I replied, 'I didn't do anything to hurt you. I simply told the truth.' Whereupon Mr. Goldstein said, 'Why did you go out of your way to help Johnson?'

"That I replied, 'If my telling the truth helps Johnson that's all right, and if it hurts you, I'm sorry.'

"That Mr. Goldstein said, 'Skidmore knows about the Affidavits you made.'

"That I replied, 'That's all right with me. If Skidmore sent you to see me it makes no difference. If Skidmore was a man he'd tell the truth himself and tell you to tell the truth.'

"That Mr. Goldstein said, 'I can't do that because if I did I'd certainly be disbarred, and I might as well be dead as disbarred.'

"That I replied to Mr. Goldstein, 'You should have thought of that, Bill, before you gave the kind of testimony you did.' "

An affidavit by Engelbretson verifies the fact that Goldstein was waiting for Green and engaged him in conversation at the time and place related in Green's second affidavit.

Goldstein denies making any of the statements attributed to him by Green. He even denies that he had a conversation with Green. The court casts aside Green's testimony and accepts Goldstein's, largely on the ground that Green is a disbarred lawyer. Green is not shown to have had any connection with the case or any interest in the parties, and no motive is disclosed which would account for a false affidavit by him. We do not think it can be presumed that even a disbarred lawyer will commit perjury. On the other hand, as will be disclosed in this opinion, Goldstein had the most urgent motive to deny the affidavit made by Green, and no reason appears on the face of the record as to why he should be believed in preference to Green.

Edward J. Hess, an attorney in good standing in this court, makes an affidavit that while the appeal from the judgment of conviction was pending in this court, defendant Johnson, accompanied by his brother John E. Johnson, an attorney, met William Goldstein in his office, and states in part as follows: "He, Johnson, opened the conversation by saying in substance that he was glad to have an opportunity to talk, which he followed by inquiring of Goldstein as to why he testified that 'he bought those properties for me when you know you bought them for Skidmore. Why did you lie?' Goldstein replied in

substance that he was sorry that he did but that he was a victim of circumstances and stated that he preferred not to discuss the matter."

This affidavit is corroborated by defendant's affidavit and by the affidavit of John E. Johnson. Goldstein makes an affidavit denying these affidavits in toto. He states: "It was purely a frame-up on the part of Mr. Hess to get me in his office so Mr. Johnson and his brother could be there. Mr. Johnson and his brother, John E., threatened me and made attempts to strike me and for a moment it appeared as though they were going to commit murder."

Hess makes another affidavit in which he makes a logical explanation as to how the parties happened to be at his office at the particular time, reaffirms the substance of his previous affidavit, and denies that Goldstein was threatened by the Johnsons.

That the court had difficulty in discounting the testimony of Hess is rather plain. After pointing out that Hess was at one time counsel for some of the co-defendants in the case, the court places a strained construction upon his testimony by stating that it "could as well be taken to mean that he (Goldstein) was sorry he had testified at all, as it could be taken to mean that he was sorry he had lied." We do not think the testimony of Hess is capable of such construction. Even though we lay aside the affidavits of the defendant and his brother, which corroborate Hess, we have a direct issue between Hess, a reputable member of the Bar, and Goldstein. Any kind of logic or reason of which we are aware requires the acceptance of Hess' version as true and that of Goldstein as false.

Title to the Albany Park Bank Building was conveyed to Ted W. Goldstein (son of William Goldstein) on July 6, 1937. On the next day, Ted W. Goldstein executed a lease on said premises wherein it was recited that the premises had been purchased by him. The rent of $250.00 per month was paid to William Goldstein by check, which checks were endorsed by William Goldstein, Agent, and also bore the additional endorsement of William Goldstein individually. This property was again leased on September 29, 1941 to the Hines Realty and Construction Company, for a term of five years, expiring September 30, 1946. The lease was signed Theodore Goldstein, by William Goldstein, his duly authorized agent. It provides for a rental of $250.00 per month for the first nineteen months, and $300.00 per month thereafter.

The affidavit of one Leo Blockus, employed in the County Treasurer's Office of Cook County, discloses that a receiver was appointed for this property on July 26, 1943, on account of non-payment of taxes. He states that William Goldstein came to his office and offered to pay $150.00 per month to apply upon such delinquency, which offer was rejected. William Goldstein subsequently came to the office and offered to pay $250.00 per month to apply upon such taxes. Blockus inquired of William Goldstein who he was representing, and Goldstein replied: "That is my building, that is my property." Goldstein also advised him that the federal government had a lien against this property and if the County Treasurer did not accept his offer of $250.00 per month, he (Goldstein) would turn the property over to the government. On July 28, 1943, William Goldstein was again at the office, and Blockus states that Goldstein said four or five times, "The property is mine, you will have to remove the receivers from my property." The court below again relies upon Goldstein's denial of these statements by Blockus and affidavits by Levine and Sampson. A reading of these latter affidavits discloses that the most which can be said of them is that affiants did not hear Goldstein say four or five times, "The property is mine." Furthermore, Levine made a subsequent affidavit in which he stated that Goldstein was talking to Blockus when he arrived at the office and obviously he did not know what was said before his arrival. Also, the other statement by Blockus in which Goldstein asserted "that is my property" is denied by nobody but Goldstein.

A significant circumstance which has been overlooked and which strongly corroborates Blockus is the fact that Goldstein was at the County Treasurer's office attempting to settle the claim for taxes. If, as he testified at the trial, this property belonged to Johnson, why was Goldstein so interested in preventing the property from being sold at a tax sale? Blockus certainly could have had no motive in making a false affidavit as to what Goldstein stated, and we see no basis for a finding other than that his testimony was true and that of Goldstein false.

At the insistence of the County Treasurer, while the property was in receivership, Goldstein took out insurance on the

property, the premium on which was over $300.00. In none of the numerous affidavits filed by Goldstein is any claim made that he was authorized to act for Johnson as agent in the management of this property. He never made any report to Johnson concerning rentals and never tendered to Johnson any of the rents collected. He never made even a single report to Johnson concerning the property, its maintenance, upkeep, management or rental. On the contrary, Marian Giles Sommer makes an affidavit that she was employed by William Goldstein from January 1938 to June 1939 as a stenographer, and that on the first of each month she typed income and disbursement statements relative to this building from longhand statements given to her by Goldstein, and that at the direction of Goldstein such statements were enclosed in envelopes addressed by her and mailed to William R. Skidmore. Goldstein denies the Sommer affidavit and, referring to the Albany Park Bank Building, states: "No statements were mailed or given to Mr. Skidmore or Mr. Johnson by me or anyone else."

Goldstein, in an affidavit dated September 8, 1943, states that he is holding the rent money on this building until such time as he is "released from the Internal Revenue Department which served me with a lien to hold all funds and property belonging to William R. Johnson." He does not state when such notice was served and there is nothing in the record to corroborate the fact that it was served. As will be subsequently shown, Goldstein offered the same excuse with reference to his retention of a $7500 escrow fund which he testified at the trial he received from Johnson. It has also been suggested that Goldstein was retaining this rent money in trust for Johnson. This is another novel and unbelievable theory. If Goldstein conveyed title to this property to Johnson, as he testified at the trial, he had no more right to collect and retain the rent without authority from Johnson, which he did not have, than he had to collect rent on any other building to which he was a stranger.

In an affidavit made by Goldstein on September 8, 1943, in reference to the Albany Park Bank Building, it is stated: "The reason that title was not transferred to William R. Johnson was that he requested me to let title remain in my son as he intended to organize a bank sometime in the future and did not want his name connected with it."

In view of the fact that Goldstein was a lawyer and of the careful supervision which must have attended the preparation of his affidavits, this statement is difficult to account for. It is in direct conflict with his trial testimony that he "caused a quit claim deed to be delivered to Johnson." In other words, at the trial he testified that title was transferred to Johnson and now he states a reason why it was not transferred. On first impression, it might appear that in his affidavit he was referring to record title, but Goldstein must know that record title is not a matter of transfer and that its perfection is optional with the person who owns the actual title. If Goldstein transferred title to Johnson, as he testified at the trial, it was then entirely up to Johnson as to whether his title should become a matter of record.

This brings us to a consideration of the proof relative to the amended motion for new trial. Defendants offered in support of their amended motion the individual income tax returns of Theodore Goldstein, son of William Goldstein, for the years 1937–1943, inclusive, affidavits by Edward H. Wait and Frank Sampson, and a lease dated January 3, 1944 between Theodore Goldstein and Hines Realty and Construction Company, together with a rider attached thereto. The government filed counter-affidavits by Theodore Goldstein, William Goldstein, Stanley A. Wodrick and Edward H. Schulz. The income tax returns filed by Theodore Goldstein are signed and sworn to by him in his individual capacity, in which he charges himself with the income from the Albany Park Bank Building and takes credit for the loss. The return for the year 1940 is typical. It states the year the building was purchased, the price, the depreciation theretofore taken, and the remaining life of the building. It shows a rental income of $900.00, claims a deduction of $1,531.08 on account of real estate tax, takes a depreciation of $1,000 for the taxable year, and shows a net loss for the year of $1,631.08. This loss is deducted from a $2,600 salary income, leaving the taxpayer with a net income of $968.92. That William Goldstein was responsible for the making of such returns by his son, Theodore, there can be no question. He dealt with the Bureau of Internal Revenue as the agent of Theodore,

he took the returns to Theodore and procured his signature thereto, and any tax shown to be due was paid by him. No point is made, and we think none could be logically made, but that William is chargeable with the contents of the returns in the same manner and to the same extent as though they had been made by him.

It is the contention of the defendants, with which we agree, that the representation contained in these returns as to the ownership of this property is inconsistent with Goldstein's testimony at the trial that he purchased this property for and delivered a quit claim deed to Johnson. The trial court seems to agree with this theory in part. It states: "Considering the mere filing of the income tax returns aforesaid and disregarding the circumstances of their filing * * * it could probably reasonably be argued that the filing by Theodore W. Goldstein of the returns could be held to be some evidence of the fact that during the years in question he had some interest in the property other than as the holder of the bare legal title."

The court then proceeds at great length to analyze the affidavits submitted by the government relative to the circumstances under which the returns were filed and finds that due to such circumstances they are without value in support of defendants' motion. It would unduly prolong our discussion to recite in detail these affidavits. We think we can show the government's position by a brief statement. It appears that the affiant Schulz of the Bureau of Internal Revenue in Chicago received information that the income from the Albany Park Bank Building had not been reported and that rents were supposedly being paid to William Goldstein, who claimed to be agent for Theodore Goldstein. Affiant Wodrick, a deputy collector, was assigned to investigate, and had an interview with William Goldstein. Wodrick's affidavit was made after such interview, in question and answer form, in the Bureau of Internal Revenue, long prior to the filing of defendants' amended motion. He testified that Goldstein, in response to a question as to who owned the property, stated, "I do not know the owner." Goldstein also stated with reference to the ownership of the property, "that he received money from persons unknown for the pur-

chase of that building. He also stated that he didn't know whether it was Skidmore or Johnson's money."

Wodrick insisted that Theodore Goldstein must file returns inasmuch as the record title was in his name. To this, William Goldstein objected because Theodore was not the actual owner. A few days later, William Goldstein agreed to the preparation of the returns and stated, "that he would like to have the matter closed as soon as possible." Wodrick prepared the returns which were subsequently made by Theodore. Wodrick, subsequent to the filing of the amended motion, made an affidavit in which he stated that he understood his question and answer statement was to be used in the motion for new trial by Johnson and that he wished to modify such statement.[1] In this affidavit he states that what he intended to say was, "Goldstein stated to me that he did not know whose money it was that he had received for the purchase of that building. At no time did I ask Mr. Goldstein who gave him the money for the purchase of that building and at no time did he say that unknown persons gave him the money to purchase the building."

Affiant Schulz states that William Goldstein on numerous occasions told him that Theodore Goldstein was the title owner of record but was not the actual owner of this property. Affiant informed William Goldstein that Theodore would be required to make the returns even though he was not the actual owner. Affiant also stated that William Goldstein refused to sign an affidavit containing the statement that his son Theodore was "the owner." The affidavit of William Goldstein also states that he was advised by government officials that the returns must be filed by Theodore. Finally he agreed so to do, took the returns which had been prepared by Wodrick, had Theodore sign them, returned them to Wodrick's office and paid the tax shown to be owing.

Theodore Goldstein states that he is not the actual owner, does not have and never did have any beneficial or financial interest in the building. As a reason for the filing of the returns, he states that he was told by William Goldstein that the Internal Revenue Department was insisting that he do so, that the situation had been explained

---

[1] It would be interesting to know under what circumstances Wodrick made this affidavit. We think it is entitled to little, if any, weight.

by William Goldstein to the Revenue Department, but nevertheless the Department required the filing of such returns.

These affidavits as to the "circumstances" are more illuminating for what they omit than for what they contain. For instance, this is the first time that Theodore Goldstein has appeared as a witness in this case, although the defendants attempted without success to procure his attendance at the trial. William Goldstein testified at the trial, "Subsequently there was a quit claim deed delivered to William R. Johnson by my son." Theodore, evidently the only person in a position to corroborate William Goldstein on this important testimony, when presented with an opportunity to so do, either refuses or fails. Is it possible that this was a mere inadvertence or has the government abandoned its effort to defend this portion of William Goldstein's testimony? That the latter appears more reasonable is also shown from an affidavit of William Goldstein. After reaffirming his testimony given at the trial, his affidavit states: "And, in particular restate that the amount expended for the purchase of the Albany Park Bank Building property was $59,887.05 and that I got that money from Mr. Johnson in the form of currency." No place, however, does he restate that his son Theodore delivered to Johnson a quit claim deed to the property. Another pertinent observation in this connection is that it is no longer claimed that Goldstein holds this property in trust for Johnson.

Another glaring omission from these affidavits (other than the first affidavit of Wodrick) is their failure to make any reference to any inquiry by the Revenue agents or any statement by Goldstein as to who owned this property. Is it conceivable that the Revenue agents in their attempt to ascertain who was chargeable with the income from this building made no inquiry of Goldstein as to who was the owner? To think so is to reflect upon their intelligence. We have no doubt but that Wodrick told the truth when he stated that he attempted to do so and that Goldstein denied knowledge as to ownership and knowledge as to who had furnished the money for its purchase. Furthermore, is there any logical basis for the thought that if Goldstein be the honest, truthful man the government and lower court would have us believe that he would have remained silent upon such a vital matter? Would not he have proclaimed to the Revenue agents, as he did at the trial, "I bought this property for Johnson and title was conveyed to him"? But whether honest or not, would he not have divulged the ownership of Johnson rather than persuade his son to commit perjury? If he was holding this property in trust for Johnson, as was formerly claimed, he was holding the income in trust. Why did he not offer to turn the income over to the Revenue Department to apply on a lien which the government had against Johnson?

The Revenue officials no doubt were familiar with the alleged false testimony of Goldstein, his leasing of the property, collection of the rents and his many other activities wholly inconsistent with his trial testimony, and felt that it was time for Goldstein either to disgorge himself of this income or pay a tax thereon. Goldstein was willing to claim he was holding it in trust for Johnson as long as it did not interfere with his rights to collect and convert, but when confronted with the latter situation he, a lawyer of many years' experience, decided to repudiate the contention that the property was Johnson's and claim it for himself. .

We think the "circumstances" destroy themselves, but more than that, the court, in accepting them as destroying the evidentiary value of the returns, has overlooked the essential point in the matter. After all, they are either true or false. Neither the court in its opinion nor the government in its brief makes any contention one way or the other; in fact, the point is not mentioned. If the returns are true, what difference does it make concerning the circumstances under which they were filed? If they are true, their probative value is no different than if they had been filed without any interference on the part of the Revenue agents. Certainly it cannot be plausibly contended that the activities of the Revenue agents were such that William Goldstein was deprived of his free will in the matter and that he knowingly procured from his son Theodore returns which were false. If the lower court properly disregarded them, it must have been because of their falsity, but even so, it would be of little benefit to the government. If such be the case, it shows the ease with which Goldstein can adjust himself under oath to serve his own purpose, even though it involves the commission of perjury or subornation thereof. If Goldstein was on trial for perjury, we think a

court would admit the returns in evidence and that a jury would accept them at their face value, notwithstanding the "circumstances" under which they were obtained.

The affidavit of Frank Sampson has to do with the leasing of the Albany Park Bank Building. He states, concerning the lease which expired on September 30, 1946 and which we have heretofore mentioned, that the rent during all the time was paid to William Goldstein as agent for Theodore Goldstein, and that generally William Goldstein came to the building each month to collect it; further, that in 1943 he informed Goldstein that he would like to have an option to renew the lease for ten years. In reply, Goldstein stated an option was not necessary, "that I could stay in possession of the premises as long as I wished." Upon affiant's insistence on a written option, Goldstein stated "that I would have to wait until the court ruled in the 'Johnson case' which was then pending before Judge Barnes. I then asked Goldstein if Johnson had anything to do with the property. Goldstein replied 'Johnson never had any interest in the property and has nothing whatever to do with it.'" Finally Goldstein suggested that affiant prepare a lease and that he would take it to Hot Springs, Arkansas, where he was going to meet his son Theodore who was in the Service. This was done and the lease was signed by Theodore. The lease expires September 30, 1956. It contains all the incidents usually found in a lease of which the lessor is the owner of the property.

Goldstein in his affidavit denies all the statements attributed to him by Sampson concerning Johnson's interest in the property. The trial court points out the fact of Goldstein's denial without comment, and as to the lease quotes from its former opinion concerning the previous lease, in which it stated: "This is not inconsistent with Goldstein's testimony on the trial." We suppose, according to this reasoning, if Goldstein should lease this property from now until eternity and retain the rents as long as he lives, it would not be inconsistent with his testimony that he purchased this property for and conveyed the title to Johnson. Further, it would not be inconsistent with the government's theory that Johnson was the owner. We do not agree with such reasoning. We think this circumstance alone, unexplained as it is, comes close to establishing the falsity of Goldstein's trial testimony.

Thus we have the testimony of Green and Hess (not to mention the defendant Johnson and his brother John Johnson) of admissions made by Goldstein that he testified falsely at the trial. We have the testimony of Blockus that Goldstein, referring to the Albany Park Bank Building, stated "that is my building, that is my property. The property is mine." We have the testimony of Sommer that Goldstein sent statements of the income and expenses on the building to Skidmore and not to Johnson; the testimony of Wodrick, a Revenue agent, that Goldstein stated, "I do not know the owner, that he received the money from persons unknown for the purchase of the building, that he didn't know whether it was Skidmore's or Johnson's money"; and the testimony of Sampson that Goldstein stated, "Johnson never had any interest in the property and has nothing whatever to do with it." In addition, the income tax returns and the long term leasing by Goldstein are utterly inconsistent with his trial testimony. Furthermore, this direct testimony finds strong corroboration in the numerous circumstances which we have related. More than that, there must be considered not only the motive which prompted Goldstein's testimony at the trial but his present motive in making affidavits in an obvious effort to serve his own interest. Taking all of these things together, we have a strong and abiding conviction that Goldstein's testimony concerning the Albany Park Bank Building was false.

We shall now refer to the escrow items, one in the amount of $10,000 and the other in the amount of $7,500. Goldstein testified at the trial that he received the $10,000 from Johnson for the purchase of certain property and that he placed it in escrow with the Chicago Title and Trust Company. This was denied by Johnson. Goldstein also testified at the trial that he received the $7,500 from Johnson in the form of currency and deposited it in the State Bank of Evanston at Johnson's request. This was also denied by Johnson. Shortly after the trial, Goldstein made a demand on the Chicago Title and Trust Company for the return to him of the $10,000 escrow deposit. J. Lawrence Holleran, an attorney for the trustee, testified by deposition that Goldstein at the time he was attempting to obtain the withdrawal of the escrow stated

that he was representing himself and no other person and "it was my money that I put up and I want it back." He then agreed to pay a reasonable attorney fee in order to avoid the filing of a suit. He offered $100 for release of the deposit. Again Goldstein said to affiant over the telephone, "All I am interested in is my money. It is my money I put up and you can't deliver under the contract and I want my money back."

Guild, the trustee, in a deposition also states: "Mr. Goldstein said he wanted the return of his money that was on deposit in escrow." Affiant asked Goldstein who was the owner of the money and he replied "that he was the owner of the money." These statements of Guild and Holleran are not denied by Goldstein, although he does state the money was given him by Johnson and that it is Johnson's money. Frank Fowler· testified that Goldstein told him "that he had $7,500 in escrow in a bank in Evanston and $10,000 in escrow in the Chicago Title and Trust Company. That Mr. Goldstein later told me he withdrew the $7,500." It appears that some law suit or claim was pending against the Bon Air Country Club and Goldstein was unable to obtain the deposit until that suit or claim was settled.

The $7500 deposit was withdrawn from the Evanston Bank on October 30, 1944, shortly after the conclusion of the trial, and a receipt given by Goldstein in his individual capacity. He has never offered to return it to Johnson, from whom he testified at the trial it was received. In fact, he still retains it, as far as the record discloses. In an affidavit executed September 10, 1943, Goldstein states: "The $7,500 returned to me by the State Bank and Trust Company was not returned to Mr. Johnson or tendered to him because sometime in the early part of 1940 I was served with a notice by the Internal Revenue Collector's Office to withhold all monies and properties which I had in my possession for Mr. William R. Johnson subject to their orders."

That statement of Goldstein's is uncorroborated. If there is any method known to the law by which one man's money can be held by another under such pretext, we do not know about it. On its face it sounds unreasonable and unbelievable. The record shows that Johnson owes money to the government and, according to Goldstein, he has $7,500 which belongs to Johnson in his possession with the government's knowledge and the government does nothing about it.

Notwithstanding Goldstein's affidavit that the money for these escrow deposits was given to him by Johnson and that it was Johnson's money, we have two disinterested witnesses who swear as to the $10,000 deposit that Goldstein said "that he was the owner of the money." Again, as to these deposits, the question naturally arises as to why Goldstein had any business obtaining their withdrawal if they were the property of Johnson. It is not even claimed by Goldstein that he had any authority from Johnson to do so. These facts and circumstances persuasively point to the falsity of Goldstein's trial testimony that these deposits were the property of Johnson.

The Bon Air Country Club was perhaps the most important of the properties involved for the reason that not only the purchase price but the large expenditures which were made upon it were charged in toto to Johnson. As already stated, it has been the government's contention and we assume it still is, that Johnson was the sole owner of this property; otherwise, all of the expenditures could not properly have been charged to him. The government in its brief summarizes Goldstein's testimony with reference to this property thus: "Briefly stated, this testimony is to the effect that Goldstein, at the request of Johnson, purchased this property for Johnson with $75,000 given him by Johnson and delivered a deed to Johnson."

It might be added that title to this property was taken in the name of Ted Goldstein and a quit claim deed subsequently delivered to Johnson.

Johnson denied that Goldstein purchased this property for him and denied that he gave Goldstein the money so to do. He admitted that title was in his name by reason of a quitclaim deed from Ted Goldstein but testified that he had conveyed a one-half interest to Skidmore; therefore, Johnson, according to his testimony, was the owner of a one-half interest in this property and Skidmore was the owner of the other one-half interest. Here again, the government contends that the only material testimony of Goldstein is that he received the $75,000 from Johnson for the purchase of this property. We think there is merit in this contention, even though inconsistent with the strong reliance which the government has heretofore placed on Goldstein's testimony as showing ownership by Johnson.

There is proof, however, that Goldstein testified falsely regarding this property, even though his trial testimony be limited in the manner urged by the government. In an affidavit by Frank Fowler, a retired business man, it was stated that William Goldstein told him "that he had bought the property known as the Bon Air Country Club for his client, Mr. William Skidmore * * *. That Mr. Skidmore had given him (Goldstein) the money to buy the said Bon Air Country Club property. That the said Mr. William Goldstein at all times referred to Mr. William R. Skidmore as 'the boss'." It will be noted that this statement is in direct conflict with Goldstein's trial testimony that he obtained the money from Johnson. Goldstein denies the statements attributed to him by Fowler. Again the trial court rejects Fowler's testimony and accepts that of Goldstein, largely on the basis of Goldstein's statement that Fowler was a discharged former employee of his and was biased against him. There is nothing in the record, however, which impugns Fowler's reputation in any manner. He is not shown to have any connection with any of the parties or any motive for making a false affidavit.

In 1942, Johnson filed a partition suit in Lake County, Illinois, covering the Bon Air Country Club (and other property) in an attempt to force a disclosure of Skidmore's interest. Maurice Green testifies that he had a conversation with Goldstein and Skidmore in the latter's office in March 1942, in which Goldstein stated, "that he (Skidmore) could not file an answer declaring his interest in the properties because if he did that such an answer in the partition suit would definitely establish his testimony (Goldstein's) in the trial of William R. Johnson as completely false. He further stated that Mr. Skidmore therefore could not file an answer but would have to take his chances on working the matter of his interest in the properties out with Johnson after the whole thing was over." Affiant is the same person heretofore referred to as a disbarred lawyer. In addition to this, the court finds that this statement is unreasonable and unworthy of belief. The record discloses, however, without dispute, that Johnson filed the partition suit making Skidmore a party and that the latter refused to answer. It also discloses, without dispute, as will be hereinafter shown by the affidavits of Marsh and Peacock, that Johnson did convey to Skidmore a one-half interest in this property and that such conveyance was made under the direction of Goldstein. Therefore, the statement which Green attributes to Goldstein in this affidavit is consistent with the undisputed facts.

Walter Henrichsen testifies that he was employed at the Bon Air Country Club and that he heard Skidmore say "that he didn't want anyone to know that he (Skidmore) had any interest in the Bon Air Country Club"; that affiant in the early part of March 1941 was served with a summons involving the Bon Air Country Club property (and other property), "that he spoke to Mr. Skidmore about the summons; that Mr. Skidmore stated to this affiant that he (Skidmore) would not contest the suit involving the property at this time; that he (Skidmore) had in his possession unrecorded quit claim deeds to the Bon Air property (and other property) * * *; that if any more papers were served on this affiant pertaining to Bon Air to take all such papers to Mr. Goldstein"; that affiant on several occasions was told "to take the bills to the creditors and instruct the said creditors that Mr. Skidmore had nothing to do with the Bon Air Country Club"; and that on several occasions he was told by William Goldstein "that no mail was to be received at the Bon Air Country Club addressed to William R. Skidmore."

This affidavit of Henrichsen is not so important as the means disclosed by the court for its elimination. The government filed an affidavit by Wilbert F. Crowley, an assistant states attorney of Cook County, in which he states that Henrichsen testified as a witness for the State in a kidnapping case and described in detail his participation in such crime. It is obvious that Crowley's affidavit was immaterial and could not properly be used for the purpose of discrediting Henrichsen. However, it was used for that purpose.

Joseph Shaffron, engaged in the lumber business, makes an affidavit that he visited Skidmore about September 1, 1940, and that Skidmore in the presence of Goldstein stated, "Joe, they are trying to pin one-half ownership of the Bon Air on me. You know, Joe, that I own it, but if anyone asks you, tell them that I have no interest in it."

To us, the most remarkable disclosure in this record is that contained in the affidavits of Beatrice Marsh and William R. Peacock. The former was a stenographer

employed by William Goldstein during the years 1938 to 1942. In her affidavit, dated July 1, 1943, she states that on April 21, 1939, at the request of William Goldstein, she prepared deeds to certain parcels of land, including Bon Air, in which Ted W. Goldstein was named as grantor and William R. Johnson as grantee, and that on July 20, 1939, at the request of William Goldstein, she prepared deeds for certain parcels of land, including Bon Air, conveying an undivided one-half interest in all of said parcels of land. These deeds were signed by William R. Johnson as grantor and named William R. Skidmore as grantee. Peacock, a lawyer, during the trial of this case was employed by Goldstein and served as successor-trustee at the request of Goldstein to the property known as the Bon Air Country Club. His affidavit is dated July 20, 1943, at which time he was serving as a Major in the United States Army. He states in his affidavit that during the summer of 1939, the exact date of which he is not certain, William Goldstein asked him to acknowledge several deeds signed by William R. Johnson, which deeds conveyed an undivided one-half interest in certain parcels of real estate to William R. Skidmore, who was a client of William Goldstein. He further stated that he did not know the legal description of the parcels conveyed but he did know that one of such properties was known as Bon Air Country Club; further, that as a notary public he acknowledged such deeds and returned them to William Goldstein.

If these two witnesses have spoken the truth, which there is no reason to doubt, they furnish convincing proof of the truth of Johnson's trial testimony that he was the owner of only one-half interest in Bon Air, as well as some of the other properties involved. If true, they just as conclusively shatter the foundation upon which this prosecution has been constructed. They furnish strong circumstantial proof of the falsity of Goldstein's testimony and demolish the implication which was drawn therefrom and used by the government to such good advantage.

Moreover, these affidavits bring to light Goldstein's carefully designed plan to preserve as a secret the fact that his friend Skidmore was the owner of one-half interest in the property. They demonstrate, if any further demonstration is necessary, his motive in giving false testimony at the trial, as well as the motive back of his testimony which resulted in his own indictment for perjury. They disclose a willingness on his part to aid in the conviction of Johnson and his codefendants upon a premise known by him to be false. This must be so, as he had delivered into his possession deeds prepared at his direction by which Skidmore became the owner of a one-half interest in Bon Air and other property. In our considered judgment, Goldstein testified falsely at the trial and has been so thoroughly discredited that his affidavits offered in opposition to the motion for a new trial carry little, if any, weight. The proof therein contained affords no substantial support for a finding that he testified truthfully at the trial.

We see no reason to prolong this opinion by a discussion of other proof and circumstances relied upon by defendants to show that Goldstein testified falsely concerning other material matters, and particularly as to other properties which he testified he purchased with money furnished by Johnson. It is sufficient to state that such proof is of a nature similar to that which we have discussed. We have purposely confined our discussion to his testimony concerning matters vital to the government's case.

As our opinion discloses, we have reached the conclusion that Goldstein testified falsely at the trial. The conviction which we entertain in this respect is without reservation. In this situation, what is our duty as a reviewing court? Must we lay aside such conviction in deference to a contrary finding by the trial court? To do so is to acknowledge our impotency to correct what otherwise may amount to a gross miscarriage of justice. We are of the view that the fundamental right to a fair trial is not dependent upon a thread of such tenuous nature.

In our former opinion 142 F.2d 588, 591, we sustained the finding of the trial court on the theory that we had the right of review only for the purpose of determining whether there had been an abuse of discretion. In so doing we emphasized that the trial court had before it "the record made upon the trial and the demeanor of Goldstein and others upon the stand"; also that "several of those who made affidavits for the defendants in support of their motion were witnesses at the trial. So it was not merely a printed record that the District Court had before it." We then

said: "We cannot say, in the light of the whole record before the District Court, that the so-called newly discovered evidence inevitably leads to the conclusion that Goldstein had testified falsely."

True, there were affidavits submitted in support of the original motion made by persons who were witnesses at the trial. Of such affidavits, however, we think it may be said that they were immaterial to the issue before the court and were subject to a motion to strike if such motion had been made. In our present consideration of the case, we have considered no evidence, whether by affidavit or in documentary form, which was offered at the trial (except, of course, the affidavits of the defendant Johnson and the witness Goldstein). Therefore, the affidavits which we have considered were made by persons whom the trial court neither saw nor heard as witnesses. All the proof which we have considered (except the affidavits of Marsh and Peacock) had to do with matters and events subsequent to the trial, and some a long time subsequent. More than that, none of the persons whose affidavits we have considered (except Peacock) were subpoenaed as witnesses at the trial.

█ Under such circumstances, it would appear that we are in as good a position to evaluate the testimony as the trial court. This was the view expressed in Hamilton v. United States, 78 U.S.App.D.C. 316, 140 F.2d 679, where a similar question was considered. There, it was held that there had been an abuse of discretion on the part of the trial court because of the improper construction which that court placed upon affidavits submitted in support of a motion for new trial. The court (page 681) stated: "An affidavit of newly discovered evidence in a criminal case should be construed fairly to the accused. Ambiguities should not be resolved in favor of the prosecution without inquiry of the proposed witness. * * * we think it was an abuse of discretion when the trial court indulged in a hypothetical interpretation of the statement of newly discovered evidence in order to make it consistent with the testimony it was intended to rebut."

█ It has been held in civil cases that where proof is submitted by deposition, affidavits and documents, the reviewing court is in as good a position as the District Court to make deductions and conclusions. Himmel Bros. Co. v. Serrick Corporation, 7 Cir., 122 F.2d 740; Nashua Mfg. Co. v. Berenzweig, 7 Cir., 39 F.2d 896. We see no reason why this rule is not even more appropriate where it is asserted the rights of a defendant in a criminal case have been prejudiced. The trial judge, of course, saw and heard Goldstein at the trial. Assuming that his appearance at the time was favorable, it is still difficult to see how the court could properly take that circumstance into consideration in weighing his affidavits in the instant matter against affidavits made by persons whom the court had not seen or heard. If such a yardstick was to be used, we think the court should have called the witnesses who had made affidavits and required their interrogation in open court, so that their testimony could be properly evaluated in connection with that of Goldstein.

It is not necessary, however, that we retract our previous holding regarding the "abuse of discretion" rule. We now think that we accorded it a more strict application than the circumstances justified. Moreover, further proof was submitted in connection with the amended motion which, as we have attempted to show, furnishes strong additional support for the contention that Goldstein's testimony was false.

█ It is our conclusion that the proof offered in support of the original and amended motion, with the attending circumstances, unerringly points to the fact that Goldstein's trial testimony was false. The finding of the trial court to the contrary was, in our judgment, an abuse of discretion. We reached this conclusion with diffidence, and in so doing attribute to the District Judge a motive as laudable and a purpose as honest as we claim for ourselves.

The lower court held applicable the rule announced in Berry v. Georgia, 10 Ga. 511, as to the requirements on a motion for new trial because of newly discovered evidence. In our former opinion, we quoted the rule therein announced, approved its application and cited numerous cases wherein it has been approved. Repetition of such rule and authorities is here unnecessary. The rule of the Berry case was applied on the premise that there had been no showing of the falsity of Goldstein's testimony and therefore the instant motion should be considered as an ordinary motion for new trial. It was upon our affirmance of the lower court's finding that Goldstein had not testified falsely that we approved the application of the rule.

■ We now have disapproved of the finding of the lower court relative to the falsity of Goldstein's testimony. It necessarily follows, so we think, that the rule of the Berry case becomes inoperative. It therefore becomes unnecessary to discuss the rule of that case or the reasons assigned as to why defendants have failed to meet its requirements.

We think that logic and sound reasoning require the application of a different rule. This must be so for the reason that on an ordinary motion for new trial the court is concerned with the probable effect which the newly discovered evidence might have upon another trial. In contrast, where the motion is based on false swearing, the concern of the court must be as to the probable effect produced on the trial already had. In the former case, the court looks to the future, in the latter case to the past, and the sole question is whether the defendants' right to a fair and impartial trial has been prejudiced by reason of the false testimony.

■ There are cases which support the general view which we have expressed. Pettine v. Territory of New Mexico, 8 Cir., 201 F. 489; Martin v. United States, 5 Cir., 17 F.2d 973; Larrison v. United States, 7 Cir., 24 F.2d 82, 87; State v. Mounkes, 91 Kan. 653, 138 P. 410, 51 L.R.A.,N.S., 286. The rule is aptly stated by this court in the Larrison case (24 F.2d page 87) that a new trial should be granted when,

"(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

"(b) That without it the jury *might* have reached a different conclusion.

"(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial."

We have already concluded that Goldstein's testimony was false. We think we need not labor the point that the jury might have reached a different conclusion without it. In fact, it was upon this testimony that the government placed much reliance that Johnson was the owner of certain properties, by reason of which he was charged with all of the purchase price as well as with the enormous expenditures made thereon. As was said in Martin v. United States, supra, 17 F.2d page 976: "There is no way for a court to determine that the perjured testimony did not have controlling weight with the jury, and, notwithstanding the perjured testimony was contradicted at the trial, a new light is thrown on it by the admission that it was false; so that, on a new trial, there would be a strong circumstance in favor of the losing party that did not exist and therefore could not have been shown, at the time of the original trial."

Again, as stated in the Pettine case, supra, 201 F. page 494, where the court considered a similar question: "Is it clear beyond doubt that this testimony did not turn the scales against him or remove from the mind of some juror a reasonable doubt of his guilt? Can it be truthfully said that it was not a gross abuse of its discretion for the trial court to refuse to grant a new trial here and to refuse to exclude this false testimony from the minds of the triers of this fateful issue * * * ?"

Other cases which have held that a reversal was required on account of error which might have affected the result are Miller v. Oklahoma, 8 Cir., 149 F. 330, 339, 9 Ann.Cas. 389; Little v. United States, 10 Cir., 73 F.2d 861, 866, 96 A.L.R. 889; United States v. Dressler, 7 Cir., 112 F.2d 972.

■ As to requirement (c) of the Larrison case, we think it may be taken for granted that the defendant Johnson knew of the falsity of Goldstein's testimony at the time it was given and likewise that he was unable to meet it. Certainly he was unable to meet it with the proof now submitted in support of a motion for new trial for the reason, as already shown, that all of such proof, with certain minor exceptions, was not in existence at the time of the trial. It relates to matters which have occurred since that time. While it may or may not be pertinent, we disagree with the lower court in its conclusion that there was been an unreasonable delay in the presentation of the newly discovered evidence. True, it has now been more than four years since the judgment was entered against the defendants, but a mere statement of the time is misleading unless considered in connection with what has transpired in the meantime. Without attempting to fix the date when Johnson and his counsel obtained each bit of newly discovered evidence, we think it can be said, with certain minor exceptions, that the record discloses its discovery subsequent to September 15, 1941, the date of the entry

of this court's judgment on the original appeal. This court held that the indictment was void and we suppose that was the law of the case until June 7, 1943, when our judgment was reversed by the Supreme Court. Certainly during that time there was no occasion for a motion for remand because of newly discovered evidence.

The record discloses that during the time the case was pending before the Supreme Court, this newly discovered evidence, or at least a portion of it, was submitted to the Department of Justice with a request for an investigation of the charge that Goldstein had testified falsely. The Supreme Court's mandate provided that it was without prejudice to defendants' right to present to this court a motion to remand on account of newly discovered evidence. We can say of our own knowledge that since that time defendants have acted promptly and without any unreasonable delay. Furthermore, the proof offered in support of the amended motion was discovered during the pendency before the Supreme Court of defendants' application for certiorari from our former decision affirming the District Court's denial of the original motion for a new trial. While the situation is unusual, perhaps extraordinary, we are of the view that there has been no delay so unreasonable as to preclude consideration of the proof which defendants have presented.

The court below also concluded that all but a few of the items of newly discovered evidence were merely cumulative of other like items presented at the trial. Again, we doubt if this conclusion is material in the instant situation. As this court said in the Larrison case, supra (24 F.2d page 87): "We agree with the court in Martin v. United States, 5 Cir., 17 F.2d [973], 976, and hold that courts should not necessarily deny motions for new trials when the perjured testimony is merely cumulative. The fact that the testimony is cumulative only, should no doubt be considered, but it is not conclusive on the motion for new trial."

Furthermore, we do not think that most of the items, in fact, none of those which we have discussed and relied upon in this opinion, are cumulative. It appears that the lower court considered as cumulative any proof which showed Goldstein's trial testimony to be false, on the theory that such proof at the same time corroborated or was cumulative to that of the defendant Johnson. If such reasoning is sound, we think it is not, it would preclude the allowance of a motion for new trial based on false testimony by a government witness in every case where such testimony was disputed by the defendant at the trial. In People v. Royals, 356 Ill. 628, 191 N.E. 194, the court, in discussing the rule as to cumulative evidence, 356 Ill. on page 639, 191 N.E. 199, stated: "The rule stated above does not bar the granting of a new trial on the ground of newly discovered evidence if the new evidence relates to a material point contested on the trial; otherwise there would scarcely ever be a new trial granted on such ground."

It is our conclusion that the defendants have brought themselves within the rule of Larrison and kindred cases and that the prejudicial effect of Goldstein's false testimony can only be remedied by a new trial. The order appealed from is therefore reversed and the cause remanded, with directions that the motion for new trial be allowed.

MINTON, Circuit Judge (dissenting).

I am unable to agree with the majority opinion because I think it clearly invades the province of the trial court. We do not sit here to pass upon the facts upon this motion. That is for the trial court. We sit only to review the trial court's action, and to determine whether or not the trial court abused its discretion.

In reaching this determination, we do not dispute with the trial court on the conclusions it reached on the facts. We determine only whether the trial court reached a decision it might reasonably have reached upon the facts before it; not whether we, on those facts, might have reached a different conclusion. If the trial court reached a conclusion which it might reasonably have reached, and excluded nothing from its consideration which it ought to have considered, it has not abused its discretion. That is the only question we have to determine. I think a fair review of the trial court's decision requires us to conclude that there was a basis in reason for its decision and that there was no abuse of its discretion.

The trial judge tried the case and heard the testimony of the witnesses whose veracity is now in question. He found against them after a most careful consideration of each contention of the appellants. He had before him not only the

witnesses at the trial, but all of the record. He did not exclude anything. He submitted his views in a written opinion covering some sixty pages, far too long to be incorporated here. We upheld his decision and judgment on the original motion for a new trial on the ground of newly discovered evidence. 142 F.2d 588. The trial court held that the showing made on the amendment to the motion, which is now before us, contained nothing to warrant it in holding differently. With this view I am in accord.

The chief controversy revolves around the ownership of a property located at 3424 Lawrence Avenue, Chicago, known as the Albany Park Building. Failure to report the income from this property was one of the charges against Johnson on the original trial. At that trial, William Goldstein testified in part as follows:

"I was requested by Mr. Johnson to go out there and purchase the building for him. * * * I purchased that property at the request of Mr. Johnson. * * * I can state that the amount expended for the purchase of that property was $59,887.05. I got that from Mr. Johnson in the form of currency. Title to that property was taken in the name of Ted W. Goldstein, my son. Subsequently there was a quit claim deed delivered to Mr. William R. Johnson by my son. This Albany Park Building property was purchased July 16, 1937."

The defendant Johnson, at the trial and by affidavit filed in the original motion for a new trial, denied that he had ever had any such transaction with Goldstein.

The jury, however, on the original trial resolved this issue against the defendant Johnson, and the Supreme Court, in a very sharp opinion somewhat critical of this court, stated most emphatically that the evidence was sufficient to sustain the verdict as to all defendants. Thus, the sufficiency of the evidence is not open to us for consideration. Considering the evidence most favorable to the Government, upon the record as originally presented to the Supreme Court, the jury was justified in finding from the testimony of William Goldstein that he had purchased the Albany Park Building at the request of Johnson, with money furnished him by Johnson, and that the title had been taken in the name of William Goldstein's son, Theodore Goldstein, who afterwards delivered to Johnson a quitclaim deed for the property. Title was taken in Theodore Goldstein's name to conceal the fact that Johnson, who intended to open a bank in the building, was the owner. It should be noted that Goldstein testified only to facts of the transaction. He did not attempt to testify categorically that Johnson owned that property. Any such statement would probably have been objectionable as invading the province of the jury. In any event, the jury would have been warranted in finding from Goldstein's testimony that Johnson was the owner of the Albany Park Building.

The new evidence submitted by the defendants on their amended motion for a new trial consists of the photostatic copies of the individual income tax returns of Theodore Goldstein for the years 1937, 1938, 1939, 1940, 1941, 1942, and 1943, and the affidavits of Edward Wait and Frank Sampson. The affidavit of Edward Wait is wholly immaterial. The income tax returns show that Theodore Goldstein returned the rentals collected from the Albany Park Building each year as his individual income and in each return claimed depreciation on the building. The affidavit of Frank Sampson shows that on January 3, 1944, Theodore Goldstein gave an option for a ten year lease on the property to the Hines Realty and Construction Company, of which Sampson was the president. This transaction was handled by William Goldstein, since his son was then in military service.

The defendants contend that these facts, because they evidence dominion over this property by Theodore Goldstein as though he were the real owner, are *conclusive* proof that William Goldstein testified falsely on the original trial, and that Theodore Goldstein is the real owner of the property—not Johnson. It does not seem to me that these exhibits attached to the amended motion force any such conclusion. For all that appears in the record, the returns of Theodore Goldstein may be false. He may have been untrue to his trust when he performed these acts of ownership and dominion. In that event his acts with reference to this property would not be in conflict with the testimony of his father, William Goldstein. However, the defendants say that since William Goldstein represented his son in leasing the property and collecting the rents and since, as the defendants assert in their amended motion and in their briefs, William Goldstein procured these income tax returns from Theodore Goldstein and filed them, he was therefore a party to Theodore Goldstein's acts

and representations of dominion and ownership over the property.

But the defendants do not disclose all the circumstances surrounding the renting of this property and the disposition of the rents. The evidence on the original motion for a new trial for newly discovered evidence showed that in September, 1941, the property had been leased by William Goldstein, as agent of Theodore Goldstein, to the Hines Realty and Construction Company for a period of five years. William Goldstein is reported to have said that the rents which he collected were being held by him, although not in a separate fund, for whoever was the true owner of the premises and that he had been served with a notice by the Bureau of Internal Revenue to hold all property and funds of William R. Johnson.

The Government, in response to the present amended motion for a new trial, has shown by the affidavits of William Goldstein and Theodore Goldstein that Theodore Goldstein was merely the holder of the legal title and had no other interest of any kind whatsoever in the property. The Government has also shown that the income tax returns on which Theodore Goldstein returned the rentals from the Albany Park Building were all either delinquent or amended returns. For the years 1937 to 1940, he had filed no returns at all, and in 1941, 1942, and 1943, when he had voluntarily filed returns, he had made no claim to rentals from the Albany Park Building.

It appears that the filing of these delinquent and amended returns came about when on April 17, 1944, Edward H. Schultz of the Bureau of Internal Revenue in Chicago was advised by an anonymous telephone communication that the income from the Albany Park Building had not been reported by anybody but that rents were supposedly being paid to William Goldstein who claimed to be agent for Theodore Goldstein. Mr. Schultz assigned Mr. Stanley A. Wodrick, a deputy collector, to conduct an investigation. Mr. Wodrick talked to the tenant of the building and thereafter contacted William Goldstein. Mr. Wodrick insisted that Theodore Goldstein was the owner and was the person obligated to report the rents received from the property since the title still stood in his name. William Goldstein objected, saying that Theodore Goldstein was not the actual owner but was only the title holder of record. Mr.

Wodrick called on William Goldstein about ten times thereafter, each time contending that Theodore should return the rents in his income tax returns. But William Goldstein continued to protest that his son was not the real owner of the building and was not under a duty to return the rents.

Representatives of the Bureau of Internal Revenue sought to get William Goldstein to sign a written memorandum containing the following recital: "I have acted as attorney and agent for my son, Theodore, the owner, in the management of the property located at 3424 Lawrence Avenue, Chicago, Illinois, purchased for my son Theodore in 1937. * * *"

William Goldstein, according to Mr. Schultz, "would not sign any affidavit containing any statement that his son Theodore was 'the owner' of the property located at 3424 Lawrence Avenue, Chicago, Illinois, or containing any statement that he purchased that property for his son, Theodore."

The representatives of the Bureau of Internal Revenue not only insisted that Theodore Goldstein was required to return as his individual income the rentals from the Albany Park Building, but also claimed that the entire sum paid as purchase price for the property was income to Theodore Goldstein in 1937, the year when the property was purchased, and demanded payment of more than $13,000 as that year's tax. William Goldstein emphatically denied that his son should assume this liability.

However, after numerous demands by the Bureau that Theodore Goldstein return the rentals on his individual income tax returns and after threats to assess the much larger tax claimed against Theodore Goldstein if he refused, William Goldstein acquiesced. Delinquent returns for the years 1937, 1938, 1939, and 1940, and amended returns for the years 1941, 1942, and 1943, were prepared by the representatives of the Bureau of Internal Revenue and delivered to William Goldstein. He obtained his son's signature on the returns and paid the tax on behalf of his son. The rents collected were sufficient to cover the tax.

The anonymous manner in which the delinquency was reported, the compulsion under which the returns were made, and the continued insistence of both Theodore Goldstein and his father that Theodore was not the owner of the property, but merely the title holder of record, are corroborated by

the agents of the Bureau of Internal Revenue and are not disputed by the defendants in any respect. Returns made under these circumstances were not the voluntary returns of Theodore Goldstein and were inconsistent with his own view of his relationship toward this property, and with the view of William Goldstein.

The District Court, having considered these additional facts shown on the amended motion together with the facts previously before it on the original motion for a new trial on the ground of newly discovered evidence, again reached the conclusion that William Goldstein did not commit perjury on the original trial of the defendants and that he has not since recanted.

The facts added to the record in this proceeding which show the making and filing of the delinquent and amended income tax returns filed by William Goldstein, together with the circumstances under which they were made and filed, do not prove that William Goldstein voluntarily took a position that the property in question was the property of Theodore Goldstein.

Although the leasing and granting of the option to lease showed dominion over the real estate, there is no evidence that William Goldstein held for, or ever paid to, Theodore Goldstein, the rents collected.

The additional evidence adduced in support of the amended motion adds nothing to the proof that was submitted to us on the original motion for a new trial on the ground of newly discovered evidence. In affirming the action of the District Court in the original proceeding in 142 F.2d 588, we said at page 591:

"In this case, the District Court found that Goldstein had not testified falsely or recanted. The court had before it for consideration not only the motion for a new trial and the supporting affidavits but, as the trial court, it had also the record made upon the trial and the demeanor of Goldstein and others upon the stand. The trial court also had for consideration Goldstein's affidavits in denial of the so-called newly discovered evidence and the affidavits of others supporting Goldstein. Several of those who made affidavits for the defendants in support of their motion were witnesses at the trial. So it was not merely a printed record that the District Court had before it.

"We cannot say, in the light of the whole record before the District Court, that the so-called newly discovered evidence inevitably leads to the conclusion that Goldstein had testified falsely. We cannot say, as a matter of law, that the District Court erred in its finding. Since the District Court found that there was no false testimony or recantation by Goldstein, the rule discussed in the Larrison case is not applicable.

"Having decided that there was no recantation or false swearing by Goldstein, the District Court then considered the case as any other motion for a new trial on newly discovered evidence would be considered. On such consideration, the court found that the rule for such motions 'has never been better nor more succinctly stated than' in Berry v. Georgia, 10 Ga. 511, which he quoted as follows:

" 'Upon the following points there seems to be a pretty general concurrence of authority, viz: that it is incumbent on a party who asks for a new trial, on the ground of newly discovered evidence, to satisfy the Court, 1st. That the evidence has come to his knowledge since the trial. 2d. That it was not owing to the want of due diligence that it did not come sooner. 3d. That it is so material that it would probably produce a different verdict, if the new trial were granted. 4th. That it is not cumulative only—viz:—speaking to facts, in relation to which there was evidence on the trial. 5th. That the affidavit of the witness himself should be produced, or its absence accounted for. And 6th, a new trial will not be granted, if the only object of the new testimony is to impeach the character or credit of a witness.'

"This is the general rule applicable where there has been no showing of recantation or false swearing and the effect of the newly discovered evidence is considered in its relation to a possible new trial. This rule has been followed in the Federal cases and is of almost universal application among the States."

The District Court, having again found that William Goldstein did not commit perjury or recant, has reached a conclusion upon the whole record which I can not say is unreasonable nor an abuse of discretion. I agree with the District Court that the additional evidence adduced on the amended motion for a new trial on the ground of newly discovered evidence is insuffi-

cient to support such a motion, because it is merely cumulative and impeaching, and would probably not produce a different verdict if a new trial were granted.[1]

I would reaffirm all we said in United States v. Johnson, 142 F.2d 588. Everything we said there is entirely in harmony with the finding and judgment of the District Court in the case now before us. The judgment of the District Court should be affirmed.

[1] See authorities cited United States v. Johnson, 7 Cir., 142 F.2d 588 at page 592.