STATE of Minnesota, Respondent,

v.

Roger Sipe CALDWELL, Appellant,

and

Roger Sipe CALDWELL, Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

Nos. 49437, 51505.

Supreme Court of Minnesota.

Aug. 6, 1982.

Robert D. Goodell and Douglas W. Thomson, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Alan L. Mitchell, County Atty., John E. DeSanto and Mark S. Rubin, Asst. County Attys., Duluth, for respondent.

AMDAHL, Chief Justice.

This is a consolidated appeal by Roger Sipe Caldwell from his first-degree murder conviction and from the denial of his motion for a new trial on the ground of newly-discovered evidence. We reverse and remand.

Roger Caldwell was arrested on July 6, 1977, in connection with the June 27 murders of Elisabeth Congdon, an elderly Duluth heiress, and her nurse, Velma Pietila. On August 5, 1977, a St. Louis County grand jury indicted him on two counts of murder in the first degree. Because of the extensive publicity surrounding the matter, Caldwell moved for and was granted a change of venue to Crow Wing County. He was found guilty as charged and was given two consecutive life sentences. His wife, Marjorie Caldwell, subsequently was arrested and charged with aiding and abetting and conspiracy to commit murder. She was tried and acquitted of all charges.

Appellant married Marjorie Congdon LeRoy, the adopted daughter of Elisabeth Congdon, in 1976, shortly after Marjorie moved to Colorado. Both had been married previously. Marjorie was one of the beneficiaries of several trusts established by the Congdon family, some of which were to terminate at specified times after the death of Elisabeth Congdon. The total value of the inheritance that Marjorie was eventually to receive as a result of the death of Elisabeth Congdon was estimated at $8,200,000. At the time of the murders, Marjorie was receiving trust income of $22,000 per year from one of the trusts, and appellant was unemployed.

Marjorie Caldwell had a history of extravagant spending. By the spring of 1977, the Caldwells were in serious financial trouble. They had purchased property that they intended to use as a horse ranch, but they were unable to make the payments and lost the property. They then moved into the Holland House Hotel in Golden, Colorado, where they lived until June 28, 1977, when they went to Duluth for Elisabeth Congdon's funeral. Despite their financial problems, they bought a horse for Rick LeRoy, Marjorie's 16-year-old son for $5,500. In January of 1977, the Caldwells also purchased some turquoise and silver jewelry for $3,500, and took a vacation at a mountain resort at a cost of $5,100. The check that appellant gave the resort was returned, however, because the account had been closed.

On May 25, 1977, appellant went to Duluth, intending to try to obtain from the Congdon trustees $750,000 with which to purchase a ranch and a $50,000 loan to pay debts. Appellant brought with him two letters from Rick LeRoy's doctor that stated living on a ranch would benefit Rick's health. One of them, which falsely stated that Rick had cystic fibrosis and was involved in testing an experimental drug for the FDA, later proved to have been forged. The trustees turned down appellant's request for funds.

The Caldwells had previously received an insurance settlement of $74,000 to compensate them for property that had been stolen from their home. The check had been issued to Marjorie Caldwell and two copayees to whom Marjorie owed $51,000. After receiving the check, the Caldwells persuaded the insurance company to reissue it to Marjorie and a fictitious payee. Appellant then endorsed the check to Marjorie in the name of the fictitious payee. On June 1, he told Marjorie's cousin, Thomas Congdon, who

was one of the trustees of the Congdon trusts as well as a beneficiary, that he was worried that criminal charges would arise from this matter and from the bad check he gave the resort. At a second meeting with Congdon on June 18, appellant told Congdon that they had no money, and he requested $25,000 from the trusts to hire F. Lee Bailey to represent them in connection with their financial difficulties. The following day, Thomas Congdon gave the Holland House Hotel a personal check for $400 to keep the Caldwells from being evicted from their rooms.

On June 20, 1977, the Golden State Bank in Golden, Colorado, repossessed the Caldwells' three cars. An arrangement was made with the bank whereby Rick LeRoy was allowed to use one of the cars for transportation to work if he returned it to the bank parking lot every night. On June 22, a gas station attendant took from appellant and Rick LeRoy a Carte Blanche credit card that had been obtained in the name of E. M. Congdon. The Caldwells had run up $756.85 on the account, which was never paid. On the following day, Marjorie Caldwell and appellant pawned some jewelry and received in return a check for $3,000. They cashed the check at a bank, receiving $10 and $20 bills. Some of this money was used to pay overdue horse boarding bills.

Despite these difficulties, Marjorie Caldwell continued to look for real estate to buy. She attempted to enter into several purchase agreements in early 1977, which soon fell through when the Caldwells failed to make payments. Nevertheless, on the weekend preceding the murders, Marjorie asked her real estate agent to show her certain property with a sale price of $1,300,-000.

On Friday, June 24, Rick LeRoy found a note from appellant on his bed at the Holland House Hotel. The note stated that appellant and Marjorie would be with real estate people all day Saturday and Sunday and that Rick could stay out until 12:30 both nights. Accompanying the note was $50 in cash, which appellant left for Rick to use for dates and gasoline. The real estate agent never saw appellant during that weekend. Rick LeRoy did not see him between Wednesday, June 22, and Monday, June 27, although he claimed to have seen two bodies sleeping in the bed in his mother's room at about 1:30 a. m. on June 27.

At about 7:00 on the same morning, Elisabeth Congdon's day nurse discovered the body of Velma Pietila on the landing on the main stairway of the Congdon mansion in Duluth. She ran to Elisabeth Congdon's bedroom and found Miss Congdon lying dead with a pillow covering her face. Police found strands of hair clutched in both of Velma Pietila's hands, a dark-colored nylon stocking tied around her left wrist, and a damaged candlestick near the body. An autopsy showed that Pietila had died of a skull fracture and loss of blood. An autopsy of Elisabeth Congdon's body revealed that the bruises on her body were inflicted shortly before her death. Marks on her left wrist and little finger indicated that she had worn a watch and a ring that were removed after she died. Miss Congdon was determined to have died of suffocation at approximately 2:00 on the morning of June 27.

Upon searching the mansion, police discovered what they suspected to be the intruder's point of entry. A pane of glass in the upper sash of a basement window was broken, and a mark that appeared to have been caused by a foot impression was found on a sofa underneath the broken window. During an experiment conducted at appellant's trial, a police officer whose arm was smaller in circumference than appellant's was unable to reach through the broken window and unlatch the sash without dislodging a piece of glass. Various parts of the mansion were dusted for fingerprints. Police found no latent fingerprints in Miss Congdon's bedroom, but discovered a small, poor-quality latent print on the candlestick. Appellant was eliminated as a possible source of this fingerprint, and none of his fingerprints were found elsewhere in the Congdon home. However, an analysis of hairs found near Velma Pietila's body showed that they "could have" been appel-

lant's hairs. Bloodstains that were collected from the bathroom and the stairway were compared with blood samples taken from Pietila, Congdon, and appellant. All were discovered to have type O blood. Blood found on a pillowcase near Miss Congdon's head had one of the same enzyme types as appellant's.

The car that Velma Pietila drove to the Congdon mansion on the night of June 26 was missing when the police arrived the following morning. A maintenance man discovered the keys to that car in a trash can at the Minneapolis-St. Paul International Airport at 8:30 a. m. The police found the car itself at 11 a. m. in the airport's short-term parking lot, and they discovered the parking ticket for the car in the same trash can in which the maintenance man found the keys. The time stamped on the ticket was 6:35 a. m. No fingerprints were found on the ticket, and the only fingerprint in the car that was identified proved to be that of Mrs. Pietila's husband. A blood stain of Type O blood was found on the floor of the car.

At 9:30 on the same morning, appellant came into the Golden State Bank in Golden, Colorado to notify a loan officer, John Hannagan, that Rick LeRoy had to take one of the Caldwell cars from the bank parking lot at an earlier time than usual in order to get to work by 8:30.[1] Hannagan noticed nothing unusual about appellant's demeanor or appearance.

At approximately 1:45 that afternoon, Bertha Huskins, the desk clerk at the Holland House Hotel, received a telephone call from appellant. He instructed her to leave a message for Marjorie to pick him up. When Ms. Huskins asked him where Marjo-

rie should go, appellant replied, "It doesn't matter, she knows."

At 7:00 on the morning of Tuesday, June 28, appellant telephoned the owner of the Wild Wood Farms, where the Caldwells boarded a horse, and stated that his mother-in-law had been killed and that the inheritance "of about $10,000,000" would cover the bills and the purchase of a horse for Rick. Later that day appellant went to the Golden State Bank to pick up the money for the trip to Duluth for the funeral. John Hannagan noticed that appellant seemed nervous and in a hurry, and that he had a scratch on his lip and one swollen hand. Appellant told Hannagan that he had cut himself shaving and that a horse had stepped on his hand.[2] While he was at the bank, appellant opened a safe deposit box and placed some papers in it. One of these papers was a handwritten document, written and signed by Marjorie Caldwell and dated June 24, 1977, in which Marjorie conveyed irrevocably to appellant all of the money—approximately $2,000,000—due her from the Chester A. Congdon Trust upon the death of Elisabeth Congdon.

Appellant, Marjorie Caldwell, and Rick LeRoy arrived at the Minneapolis airport on Tuesday, June 28. They were met by Marjorie's attorney, David Arnold, who noticed that appellant had a cut above his eyebrow and one near his lip. They flew to Duluth the same day, and checked into Rooms 801 and 803 of the Duluth Radisson Hotel, where they stayed the nights of June 28 and 29. Police officers who met with Marjorie, appellant, and David Arnold at the Duluth police department on June 29 also noticed that appellant had a cut or scratch

---

1. The state contends that Hannagan was mistaken in his testimony, and that he could not have seen appellant on the morning of June 27, for the following reasons: appellant told him that Rick needed the car to get to work by 8:30, but Rick left the hotel to go to the bank that morning without having seen or spoken with appellant; Rick had used the car, according to the arrangement with the bank, in order to get to his job with a Mr. Bartlett, for whom Rick no longer worked after Friday, June 24; appellant would have had to walk directly in front of Hannagan's secretary's desk in order to speak with Hannagan, but the secretary testified that she did not see appellant that morning; and appellant did not pick up the $300 that had been wired to him for travel costs until the following day, even though a message had been left for him on the afternoon of the 27th to come to the bank and pick up the money.

2. Appellant later told Rick LeRoy that he received the cut when a horse knocked him against a wall.

on his lip and that his right hand was swollen.

On June 29, appellant telephoned Marjorie Caldwell's riding instructor from Duluth and told her to arrange for the purchase of a horse for Rick. The estimated cost of a horse of the type appellant requested would have been between $40,000 and $75,000. Appellant did not mention the death of Elisabeth Congdon during this conversation.

On the evening of June 30, several Duluth police detectives went to the Duluth Radisson to interview the Caldwells. Upon learning that the Caldwells had left the hotel that afternoon, they obtained permission to search rooms 801 and 803. They found an old suitcase, which was identified as one appellant had brought from Colorado, and two boxes from a Duluth clothing store. Attached to the suitcase was a North Central Airlines baggage tag numbered 86349 from the Caldwells' flight from Minneapolis to Duluth on June 28. Inside one of the discarded boxes police found a sales receipt from Host of Minneapolis, a gift shop in the Minneapolis Airport. No latent fingerprints were found on the receipt.

On July 5, the Duluth police, having discovered that the Caldwells were then registered at Room 307 of the Holiday Inn in Bloomington, obtained a search warrant for that room. The Caldwells were not present when the police arrived because appellant had become ill that morning and had been rushed to Methodist Hospital in St. Louis Park. In the hotel room, police found clothing lying on the beds, apparently in preparation for packing, and a wicker case or basket similar to one missing from Elisabeth Congdon's bedroom closet. They also found a tan suede garment bag and, inside the drawer of a nightstand, a blue plastic container filled with jewelry. Some of the jewelry was identified as having belonged to Elisabeth Congdon; the watch and the ring missing from her body were among the items in the container. Seventeen other pieces of jewelry that were missing from the Congdon home were never recovered. Most of the other jewelry found in the container was identified as belonging to Marjorie Caldwell. The North Central Airlines tag on the garment bag was numbered 86350. This baggage tag was consecutive in number to the tag attached to the old suitcase that appellant brought from Colorado to Duluth and left in the room at the Duluth Radisson. The name on the identification tag on the bag appeared to have been written in appellant's handwriting. The items found in the Caldwells' room at the Holiday Inn were processed for latent fingerprints, but none were produced.

By approximately 10:30 a. m. on June 27, Colorado police had been notified that appellant was a suspect in the murders, and they immediately began an investigation. On July 2, Bertha Huskins, the Holland House desk clerk, told police that a Radisson Duluth envelope, which was addressed to appellant in what appeared to be appellant's own handwriting, had arrived at the hotel on June 29. The letter was postmarked Duluth, June 27, 1977. The police seized the envelope pursuant to a warrant, and found inside it a smaller, folded envelope that contained a gold coin. The coin was identified as one that was missing from a display case in Elisabeth Congdon's bedroom. A latent fingerprint identified as appellant's was found on the back of the envelope. No identifiable fingerprints were found on the coin itself.

On July 1, Duluth police interviewed two employees of the Host Gift Shop in the Minneapolis Airport. Both told police that a man carrying a wicker case had purchased a suede garment bag early on the morning of June 27. They looked at six photographs. One of the employees, Sandra Schwarzbauer, identified appellant's photograph as depicting someone she had seen before. On July 5, Ms. Schwarzbauer picked out a different picture of appellant, but then stated that she was not sure that appellant was the man who bought the bag because the man in the shop had been wearing glasses. The other witness eliminated appellant as the man in the shop; she instead identified another photograph as possibly depicting the person in the gift shop.

At 12:20 a. m. on Wednesday, July 6, Duluth police officers and local police went to Methodist Hospital and arrested appellant for the murders of Congdon and Pietila.

At appellant's trial, the State's fingerprint expert, Steven Sedlacek, testified that the fingerprint on the envelope that contained the gold coin was identical to the known print of appellant's right thumb. Sedlacek's testimony was based upon his comparison on July 2 and 3 of the developed fingerprint on the envelope with appellant's known fingerprints. Sedlacek developed the fingerprint, using a chemical called nin-hydrin, on the night of July 2, 1977, immediately after he received the envelope. He photographed the print as soon as he developed it because nin-hydrin prints gradually deteriorate. Using the negative of that photograph, Sedlacek later made an enlargement of a part of the print to use for demonstrative purposes at the trial. During the trial 1 year later, appellant's attorney took the envelope, the enlargement, and appellant's known prints to another expert, who examined only the enlargement and agreed that the fingerprint appeared to be appellant's. Defense counsel therefore did not call the expert at trial. The State's handwriting expert testified at the trial that the handwriting on the envelope was that of appellant, although she admitted that certain discrepancies existed between the writing on the envelope and appellant's handwriting exemplars. Appellant's expert testified that the writing had been done slowly and was probably a forgery.

At the trial, both of the Host Gift Shop employees positively identified appellant as the man who bought the suede garment bag on the morning of June 27, 1977. They testified that the man was carrying a wicker basket, which he attempted to put inside the suede bag after making the purchase. The witness from whom the man purchased the bag testified that the bag was of the same type as the one found in appellant's hotel room, and that the man paid for it with three $20 bills. One of the witnesses described the man in the shop as 5′ 10″ tall, weighing about 190 lbs., about 45–47 years

old, paunchy, with short, curly hair and a light complexion, and wearing tinted glasses and a short-sleeved yellow shirt. The other witness described the man as 5′ 10″ tall, 180–190 lbs., with short sideburns, a large stomach, and wearing white, tinted glasses, blue jeans and an alpaca sweater. Despite the differences in their descriptions, however, both witnesses identified appellant in the courtroom. Because the witnesses had seen in the news media some of the same photographs of appellant that police previously had shown them, appellant argued that the in-court identification was unreliable and should not have been admitted into evidence. The trial court denied his motion to strike the identifications.

After deliberating for 3 days, the jury returned two verdicts of guilty of murder in the first degree. Approximately 1 year later, appellant's wife, Marjorie Caldwell, was acquitted of all charges of aiding and abetting and conspiracy to commit murder. After Marjorie's acquittal, appellant petitioned the court for a new trial on the grounds of newly-discovered evidence, discovery violations by the prosecution, and prosecutorial misconduct. The court denied the motion.

Appellant has raised the following issues in this appeal:

1. Whether the postconviction court abused its discretion by denying appellant's motion for a new trial based upon newly-discovered evidence that is alleged to have resulted in the acquittal of Marjorie Caldwell;

2. Whether the postconviction court erred by failing to order a new trial on the grounds of the prosecutor's alleged violation of discovery rules and appellant's constitutional rights;

3. Whether appellant was denied his right to a fair trial by statements made by the prosecutor in his closing argument and by testimony elicited in violation of a court order;

4. Whether the verdict form, which required the jury to determine appellant's guilt or innocence, was an incorrect state-

ment of the law that required the jury to use an improper standard to determine his guilt;

5. Whether the in-court identification of appellant by the employees at the Host Gift Shop after they had seen the same photographs of appellant in the newspapers that police showed them before the trial created a substantial likelihood of misidentification; and

6. Whether the evidence presented at the trial was sufficient to support appellant's conviction.

1. Appellant argues that if certain evidence that was introduced at Marjorie Caldwell's trial had been available to him, he probably would have been acquitted. He also asserts that much of this evidence was known to the prosecutor and that the prosecutor's failure to disclose it was a violation of discovery rules. The evidence that appellant characterizes as newly discovered and thus entitling him to a new trial is: expert testimony, based on a negative allegedly not available at appellant's trial, that the fingerprint on the envelope that contained the gold coin was definitely not appellant's; testimony of Candice Byers, a waitress at the Holland House Hotel, that she saw appellant at about 10 p. m. on the night of June 26, 1977; a statement by appellant's former wife that appellant's "coin collection" was merely a jar of pennies; a statement by Thomas Congdon in which he told a Duluth police officer that he had hired private detectives immediately after the murders to follow the Caldwells; and statements made by the private detectives.

The envelope containing the gold coin is significant because it is the only evidence

introduced at appellant's trial that actually showed him to have been in Duluth at the time the murders were committed. Steven Sedlacek's initial identification of the fingerprint was based upon a comparison of the developed print with appellant's known fingerprints. No expert other than Sedlacek saw the original developed print until nearly 1 year later, during appellant's trial, when appellant's attorney gave another expert the envelope, a card with appellant's fingerprints, and the enlargement Sedlacek made for display purposes. Unknown to appellant's counsel, however, was the fact that by the time of the trial the original print had deteriorated. Appellant states that because of the deterioration,[3] which would have been apparent only to an expert, his expert used Sedlacek's enlargment of part of the print rather than the original as the basis for his conclusion that the print on the envelope was appellant's.[4] He did not mention the deterioration to appellant's attorney.

In a subpoena issued prior to appellant's trial, appellant's attorney had directed the prosecutor to produce all documents relating to the fingerprint evidence, but he did not specifically request the negative. A report that Sedlacek had prepared did not mention the negative, although Sedlacek stated at trial that his report included all matters relating to the identification of the fingerprint. Appellant's attorney had never received the negative and was not specifically informed of its existence.

By the time of Marjorie Caldwell's trial 1 year later, the original fingerprint had become almost invisible. Sedlacek testified then that he had noticed some deterioration at the time of appellant's trial; however, he had not disclosed this fact either to appel-

---

3. At Marjorie Caldwell's trial, Sedlacek testified that:.

The durability of the nin-hydrin developed print itself can vary according to a number of factors. Generally, it is considered to be rather short-lived, and this is the reason that a nin-hydrin developed print is immediately photographed. The print can deteriorate in a matter of days or over a period of time, involving months or even possibly years, depending on a number of factors.

4. Sedlacek had testified at appellant's trial that:

We do not make examinations from photographs, especially enlargements, because it is easy in the photographs to get some distortion or change of perspective in there, which is not present in the actual items. We make our examination based on our training and experience from the actual prints, not from the photographic enlargements.

lant's attorney or to the prosecutor. Because the print itself was no longer useful for identification purposes, only the negative of the photograph that Sedlacek took at the time of his initial identification was sufficiently accurate for use in Marjorie's trial. Marjorie Caldwell's attorney requested the prosecutor to produce the negative, which at that time was on file with the Colorado Bureau of Investigation. After examining the negative and the enlargements and contact prints prepared from it, another fingerprint expert testified that the fingerprint on the envelope was a very poor latent print to try to identify, but that it was not appellant's. He also testified that the enlargement that Sedlacek had prepared for a comparison chart to be shown to the jury in appellant's trial had been mounted at an incorrect angle. Two other experts also agreed that the print could not have been appellant's. The prosecutor then stated to the court that he would ask the jury to disregard the latent print as a misidentified fingerprint.

Candice Byers, a waitress at the Holland House Hotel, testified at Marjorie Caldwell's trial that she saw appellant in the hotel lobby at about 10 p. m. on June 26, 1977. This testimony is significant because if appellant actually had been in Golden at 10 p. m. Colorado time, it is highly unlikely that he could have traveled to Duluth and committed the murders at 2 a. m. Minnesota time, the estimated time of the victims' deaths. Appellant contends that Byers' testimony was newly-discovered evidence that could not have been discovered through reasonable diligence by the time of the trial. Byers' name was not on the prosecutor's list of prospective witnesses. Furthermore, because Byers told Colorado police on July 1, 1977, that she did not recall having seen the Caldwells on June 26, and because on July 9 she gave the police a written statement to the same effect, appellant's counsel did not consider her to be a likely source of favorable defense testimony. Appellant therefore argues that the failure to interview Byers before the trial did not constitute a lack of diligence.

On April 19, 1979, an investigator and an attorney for Marjorie Caldwell interviewed Byers in Colorado. She told them that she had seen Roger Caldwell on the night of June 26, 1977, and that she was certain of the day because she remembered that at the time she saw him she was "sneaking" a beer from the hotel bar, which was closed on Sundays. She stated at the trial that she did not disclose this information to police in June 1977 because she was not then aware of its significance. The State contends that Byers' testimony is not newly-discovered evidence because she was known to appellant's counsel at the time of the trial, and that her testimony is untrustworthy in light of her previous statements to police.

The cornerstone of appellant's defense is his contention that he was framed by other members of the Congdon family, and that much of the evidence adduced at trial supports this theory. Appellant's frameup defense as presented at his trial was based in large measure on the State's lack of evidence proving that he had flown to and from Colorado on the 26th and 27th of June and on the apparent absurdity of the theft of Elisabeth Congdon's jewelry when the alleged motive for the murder was to hasten Marjorie Caldwell's receipt of her inheritance. Appellant did not produce any positive evidence at trial that he had been framed.

Thomas Congdon testified at appellant's trial, by means of a videotape deposition, regarding certain of his activities following the murders. Appellant contends that it was not until Marjorie's trial that appellant's counsel discovered that, immediately after the murders, Congdon had hired a private detective agency to follow and observe the Caldwells. On June 29, 1977, Congdon had conversed by telephone with Sergeant Greene of the Duluth Police Department. During this conversation, which was recorded, Congdon explained to Greene that he had hired detectives to protect his family, and that "information can be bought so I gave some money to a group called Colorado Private Investigators, a guy named William Furman, and I told him to go out in the street and use the funds in a

sense to see what he could find out." He also told Sergeant Greene that a detective was in Duluth keeping the Caldwells under surveillance at that time, and that the detectives were "doing some things I don't think sometimes you guys are allowed to do." Congdon testified at Marjorie Caldwell's trial that by the latter remark he was referring only to electronic eavesdropping and the purchase of information.

Appellant argues, however, that this conversation is persuasive evidence that he was framed by someone who hired Furman and Fick to plant incriminating evidence such as the jewelry and the garment bag in his hotel rooms in Duluth and Bloomington. The State contends that both the transcript of the conversation and the police report accompanying it were given to appellant's counsel in September of 1977, not in May of 1978 as appellant claims. According to the State, at the beginning of appellant's cross-examination of Thomas Congdon on May 26, 1978, the prosecutor handed a copy of the police report and the attached transcript of the telephone conversation to appellant's attorney, stating "I believe you have a copy of it." As appellant's attorney took the report and transcript, he replied, "I just didn't have it in front of me, here." The State contends that this interchange must lead to the conclusion that appellant's counsel actually had a copy of the report and statement before the trial. Appellant's counsel insists, however, that he had a copy of the police report and a summary of the conversation, but that he never received a copy of the transcript itself. The postconviction court nevertheless found that the transcript had been disclosed to appellant's counsel and therefore clearly did not constitute newly-discovered evidence.

In April of 1978, the prosecutor received transcripts of conversations between an agent of the Colorado Bureau of Investigation and two of Congdon's private detectives, William Furman and Gary Fick. During one of these conversations, Furman told the CBI agent that he and Fick had gone to Duluth on June 28, 1977, had followed the Caldwells to the Duluth Radisson, and that at about 11:50 that night, they "were able to overhear the Caldwells at their door stating, 'I hope we can get away with this.'" Furman and Fick both had been listed as prosecution witnesses, but the State later concluded that they were not telling the truth and decided not to call them as witnesses. Appellant neither specifically requested nor received copies of the transcripts of Fick's and Furman's conversations.

William Furman testified at Marjorie Caldwell's trial but refused to answer questions on the ground of self-incrimination relating to the extent of his investigation in Minnesota. Furman admitted that Thomas Congdon had hired him, but denied ever having been to Duluth or to the Caldwells' Bloomington hotel room. It appeared that Furman had falsified some of the reports he made to Congdon in an effort to justify his fees, and that he refused to answer questions about his investigation of the Caldwells in order to avoid prosecution under Colorado law.

Appellant asserts that the statements of Furman and Fick, together with the transcript of Thomas Congdon's conversation with Sergeant Greene, constitute newly-discovered evidence that Furman, Fick, or other employees of the detective agency had been present at all of the places in which incriminating evidence was found, and that the prosecutor's failure to produce Furman's and Fick's statements merely because he believed that they were lying constituted a violation of Minn.R.Crim.P. 9.01 subd. 1(1)(a). The postconviction court held that appellant's counsel knew or should have known about the detectives from Congdon's statement and from news reports, and that he failed to exercise due diligence by not requesting Furman's or his employee's statements or interviewing Furman. The court also held that the prosecutor had committed a violation of the discovery rules by failing to disclose the statements, since Furman and Fick had been listed as prospective

witnesses,[5] but that the state's nondisclosure was not material and therefore not a violation of due process.

The State had introduced as evidence in appellant's trial a copy of a divorce decree awarding appellant a coin collection. The prosecutor used this document as evidence that appellant had an interest in coins that would motivate him to steal the gold coin from Elisabeth Congdon's bedroom and mail it to Colorado. Appellant's counsel attempted to show that appellant was not a serious coin collector and that the "collection" in question was merely a jar of pennies. After appellant's conviction but before Marjorie Caldwell's trial, Marjorie Caldwell's lawyer obtained from the prosecutor a statement made by appellant's former wife, Martha Caldwell, to the effect that appellant did not own a coin collection as such, but had been awarded only some pennies, nickels, and dimes worth a total of $50 to $100. Appellant contends that Martha Caldwell's statement also should be regarded as newly-discovered evidence.

Of all of the material appellant urges this court to hold to be newly-discovered evidence entitling him to a new trial, the most troubling is the fingerprint on the envelope. The State argues that, since appellant's counsel undoubtedly knew or should have known that the enlargements of the fingerprint had to have been made from a negative, he failed to exercise due diligence because he did not make a specific request for the negative. The postconviction court agreed, and held further that the State did not violate discovery rules by failing to disclose or to produce the negative.

■ We agree that the prosecutor did not violate the discovery rules with respect

to the negative. Minn.R.Crim.P. 9.01 subd. 1(4) requires the prosecutor to disclose and to provide defense counsel with access to results or reports of fingerprint identification; the prosecutor complied fully with this rule by providing appellant with the envelope bearing the original fingerprint, the photographs developed from the negative, appellant's known fingerprints, and the identification results reached by the State's expert. The prosecutor also complied with Minn.R.Crim.P. 9.01 subd. 1(6), which requires the disclosure of exculpatory information. Because both the State's and appellant's expert initially identified the fingerprint as appellant's, the negative would have been incriminating rather than exculpatory evidence; therefore the prosecutor did not violate the rule by failing to disclose or produce the negative. Nevertheless, we have concluded that the discovery, subsequent to the trial, that Steven Sedlacek's testimony regarding the fingerprint was incorrect entitles appellant to a new trial.

The federal courts traditionally have applied two different rules to requests for new trials on the ground of newly-discovered evidence. The traditional test is whether the new evidence "is so material that it would probably produce a different verdict if the new trial were granted." *Berry v. State*, 10 Ga. 511, 527 (1851). In certain cases, however, where the evidence in question is not actually "newly-discovered" but where a witness has recanted or it has been discovered that false testimony was given at the trial, the so-called *"Larrison* rule" applies.[6] This rule provides that a new trial may be granted on the grounds of false or perjured testimony where:

---

**5.** Minn.R.Crim.P. 9.01 subd. 1(1)(a) provides:

The prosecuting attorney shall disclose to defense counsel the names and addresses of the persons whom he intends to call as witnesses at the trial together with their prior record of convictions, if any, within his actual knowledge. *He shall permit defense counsel to inspect and reproduce such witnesses' relevant written or recorded statements* and any written summaries within his knowledge of the substance of relevant oral statements

made by such witnesses to prosecution agents.

(Emphasis added).

**6.** This rule also has been acknowledged by the courts of several states, including Minnesota. See, e.g., *State v. Naeole*, 62 Hawaii 568, 617 P.2d 820 (1980); *State v. Hill*, 312 Minn. 514, 253 N.W.2d 378 (1977); *Whelan v. State*, 298 Minn. 545, 214 N.W.2d 344 (1974); *Marshall v. State*, 305 N.W.2d 838 (S.D.1981); *Pickering v. State*, 260 N.W.2d 234 (S.D.1977).

(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without it the jury *might* have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir. 1928) (emphasis in original); *see, e.g., United States v. Johnson*, 327 U.S. 106, 111 n.5, 66 S.Ct. 464, 466 n.5, 90 L.Ed. 562 (1946); *United States v. Wallace*, 528 F.2d 863 (4th Cir. 1976); *Newman v. United States*, 238 F.2d 861 (5th Cir. 1956); *Gordon v. United States*, 178 F.2d 896 (6th Cir. 1949), *cert. denied*, 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353 (1950); *United States v. Persico*, 339 F.Supp. 1077 (E.D.N.Y.), *aff'd*, 467 F.2d 485 (2d Cir. 1972), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1360, 35 L.Ed.2d 613 (1973). 2 C. Wright, *Federal Practice and Procedure*, § 557 at 525 (1969).

The Court of Appeals for the Ninth Circuit has criticized the *Larrison* rule, arguing that no reason exists for treating false testimony differently from newly-discovered evidence. *United States v. Krasny*, 607 F.2d 840, 844 (9th Cir. 1979) *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980). We disagree. In the case of ordinary newly-discovered evidence, as, for example, where a witness comes forward who did not testify at the defendant's trial, a heightened standard of materiality—that the new evidence "probably" would produce a different result—seems to be necessary because this new evidence has not been tried. The trial court is thus required to anticipate the effect on a second trial of evidence of unknown reliability. To avoid

retrying defendants in all cases in which any new evidence, no matter how dubious or inconsequential, is discovered after trial, it became necessary to impose a rule permitting new trials only in those unusual circumstances in which the newly discovered evidence probably would produce a different result. The situation is different, however, where the evidence meets the requirements of the *Larrison* rule. In those cases, because the witness has recanted [7] or other discovery has been made regarding the falsity of the testimony, the court has already been able to make a determination that the testimony actually was false; thus the matter of credibility, as it concerns a *second* trial, is less important. The "newly-discovered evidence" in such cases, in fact, is the *absence* of certain testimony, rather than the addition of new material, at a second trial. Thus the court is really considering what impact the false testimony had on the jury in the first trial; under *Larrison,* it is necessary only that the jury "*might* [8] have reached a different conclusion" if the testimony had not been given. *Larrison v. United States*, 24 F.2d at 87 (emphasis in original). In *United States v. Johnson*, 149 F.2d 31 (7th Cir. 1945), the court analyzed the difference between the two rules as follows:

[O]n an ordinary motion for a new trial the court is concerned with the probable effect which the newly discovered evidence might have had upon another trial. In contrast, where the motion is based upon false swearing, the concern of the court must be as to the probable effect produced on the trial already had. In the former case, the court looks to the future, in the latter to the past, and the sole question is whether the defendant's right

---

7. Courts tend to view recanted testimony with suspicion because of the possibility that it was obtained through coercion. *See, e.g., State v. Hill*, 312 Minn. 514, 523, 253 N.W.2d 378, 384 (1977); *State v. Mastrian*, 285 Minn. 51, 73, 171 N.W.2d 695, 708 (1969), *cert. denied*, 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970); *State v. Arradondo*, 260 Minn. 512, 520, 110 N.W.2d 469, 475 (1961). Therefore, even though the *Larrison* rule contains a less strin-

gent materiality standard, new trials nevertheless will not be granted unless the court can be reasonably certain that the recantation is genuine.

8. "Might" has been said to mean "something more than an outside chance although much less than the 'would probably' of the *Berry* rule." *Kyle v. United States*, 297 F.2d 507, 512 (2d Cir. 1961).

to a fair trial has been prejudiced by reason of the false testimony.

*Id.* at 44. The same court went on to point out:

> There is no way for a court to determine that the perjured testimony did not have controlling weight with the jury, and, notwithstanding the perjured testimony was contradicted at the trial, a new light is thrown on it by the admission that it was false, so that, on a new trial, there would be a strong circumstance in favor of the losing party that did not exist and therefore could not have been shown, at the time of the original trial.

*Id.* (quoting *Martin v. United States,* 17 F.2d 973, 976 (5th Cir. 1927)).

The fingerprint expert's testimony was damning—and it was false. It was unquestionably material; its significance should not be underestimated. Although the subsequent determination that someone other than appellant made the fingerprint does not eliminate the possibility that appellant was in Duluth on June 26 and 27, the State produced no evidence other than the fingerprint and the handwriting on the envelope that showed him to have been there on those dates. Sedlacek's testimony, uncontroverted at trial because appellant's expert apparently had been unable to make an accurate identification from the enlarge-

ment and the deteriorated original print, not only placed appellant in Duluth but destroyed the credibility of the testimony of appellant's handwriting expert that the address on the envelope was forged.

An appellate court cannot retry the facts, but must take the view most favorable to the State and must assume that the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). If, as we must assume, the jury believed that the fingerprint was appellant's and that therefore he must have been in Duluth at the time the murders were committed, it relied in part on totally incorrect evidence in finding appellant guilty. He has the right to be tried, insofar as possible, on the basis of true and correct evidence; to deny him this right is to deny him a fair trial.[9]

Some courts have held that the *Larrison* rule's less stringent standard of materiality is appropriate only where the witness' testimony was deliberately false. *See, e.g., United States v. Strauss,* 443 F.2d 986, 989–90 (1st Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). Although the rule is generally used in cases involving perjured or recanted testimony,[10] the court in *Larrison* actually relied on *Martin v. United States,*[11] 17 F.2d 973 (5th Cir. 1927), in which the court stated:

---

9. We do not feel the need to reach the constitutional issue of whether this may amount to a denial of due process; instead, our decision is based on our conclusion that the denial of a new trial in this case is "inconsistent with the correct administration of criminal justice * * * which it is our duty as an appellate court to supervise." *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 571 (2d Cir. 1961). *See State v. Borst,* 278 Minn. 388, 397, 154 N.W.2d 888, 894 (1967).

10. We cited a version of the *Larrison* rule in *Whelan v. State,* 298 Minn. 545, 214 N.W.2d 344 (1972), in which we stated that a new trial should be granted in cases of recanted testimony "if (a) the defendant has acted with due diligence in seeking a new trial, and (b) the court is reasonably convinced that the witness has indeed recanted and that without this witness' perjured testimony at trial the jury might well have reached a different verdict." *Id.* at 545, 214 N.W.2d at 344; *see State v. Hill,* 312 Minn. 514, 522, 253 N.W.2d 378, 384 (1977).

11. In *Martin,* the defendant petitioned the court for permission to apply to the district court for a new trial on the ground that a witness who testified at his trial had signed an affidavit stating that "all of [the] testimony was false and untrue, and [that the witness] now wishes to correct it." 17 F.2d at 975. The prosecutor then submitted a counter affidavit, signed by the same witness, in which the witness stated that he had not been given the opportunity to read the affidavit carefully; that he had objected to the statement that what he had said at the trial was false; that he had been made to sign the affidavit as it was; and that his testimony at the trial had been true. *Id.* The next day, an affidavit was filed by a Mr. Kraus (apparently defendant's attorney), in which he stated that the witness had signed the first affidavit of his own free will, with knowledge of its contents, after he had been given an hour to read it. Kraus also stated that the witness asked to amend the affidavit to say that his testimony was mistaken, but Kraus told him

In our opinion it is the duty of a trial court to grant a new trial, where a witness at the original trial subsequently admits on oath that he committed perjury, *or even that he was mistaken in his testimony*, provided such testimony related to a material issue, and was not cumulative.

*Id.,* at 976 (emphasis added); *see LaFever, Inc. v. All-Star Insurance Corp.,* 571 F.2d 1367 (5th Cir. 1978) (dictum); *United States v. McBride,* 463 F.2d 44, 51 (5th Cir.), *cert. denied,* 409 U.S. 1027, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972) (Rives, J., dissenting on other grounds). We believe this approach is preferable to that which requires a showing of deliberate falsehood on the part of the witness; we do not believe that the witness' state of mind necessarily should be the factor that determines whether a defendant is entitled to a new trial. In fact, the discovery in this case that the fingerprint expert had misidentified the fingerprint lacks the dubious character of a recantation. We therefore hold that, under the unusual circumstances of this case, where the uncontroverted testimony of the state's expert subsequently proves to be incorrect and that testimony was the basis of the only circumstantial evidence tending to establish that appellant was in Duluth on the date of the murders, appellant is entitled to a new trial. Although Sedlacek never "recanted" his own testimony, there appears to be no doubt that the fingerprint was misidentified, and the postconviction court did not question the inaccuracy of Sedlacek's testimony. This, in our opinion, satisfies the first requirement of the *Larrison* rule. Furthermore, we find that the second requirement, that a jury might have reached a different result, is satisfied.[12] It is true that the state produced highly credible evidence that appellant had a motive for murdering Elisabeth Congdon. Other evidence of his guilt included the discovery of some of the missing jewelry and the wicker basket in his motel room, the injuries to his face and hand, and the testimony of the airport gift shop employees. Nevertheless, the State's case is not without significant flaws. For example, an experiment undertaken at the trial showed that appellant's arm was too large to fit through the broken window at the Congdon home. Appellant's fingerprints were not found anywhere on the premises. Additionally, the State was unable to produce any record from any airline's passenger lists of appellant's having traveled from Colorado to Minnesota and back on the dates in question. In light of such weaknesses in the State's case, we are unable to conclude that in a second trial at which the fingerprint testimony is *not* introduced, appellant would necessarily be found guilty. We also conclude that the third requirement of the rule has been met. It is evident that appellant's counsel did not know, and we do not believe that under the circumstances he could have been expected to know,[13] that Sedlacek misidentified the fingerprint.

that that would not help the defendant. *Id.* Although the court noted (despite Kraus' advice to the contrary) that a trial court has the duty to grant a new trial "even where [the witness] was mistaken in his testimony," *id.* at 976, it held that the defendant was not entitled to a new trial in this case because the witness' first affidavit appeared to have been obtained involuntarily. *Id.*

**12.** Appellant argues that Marjorie Caldwell's acquittal tends to show that the same evidence that was presented at her trial would also result in appellant's acquittal. We emphasize, however, that the acquittal of Marjorie Caldwell of crimes different from those with which appellant was charged has no bearing on the issue of whether appellant should receive a new trial. *See, e.g. Standefer v. United States,*

447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980); *State v. Cegon,* 309 N.W.2d 313 (Minn. 1981).

**13.** We note that even if we were to decide this issue using the *Berry* test for newly-discovered evidence, we would nevertheless disagree with the postconviction court's holding that appellant's counsel failed to exercise due diligence. Even assuming that appellant's counsel knew or should have known of the existence of the negative, he reasonably could have concluded that the negative was unnecessary *because he had access to the envelope itself.* He had no reason to know that by the time of trial only the negative could have been used to show discrepancies between the print on the envelope and appellant's known prints. Neither appellant's counsel nor the prosecutor were

We also hold that under the unique circumstances of this case, the alibi testimony of Candice Byers may be considered newly-discovered evidence. A new trial may be granted on the basis of newly-discovered evidence if the petitioner shows that the evidence could not have been discovered through the exercise of due diligence before the trial; that at the time of the trial the evidence was not within petitioner's or his counsel's knowledge; that the evidence is not impeaching, cumulative, or doubtful; and that it would probably produce a result different from or more favorable than that which actually occurred. *See, e.g., Martin v. State,* 295 N.W.2d 76, 78 (Minn.1980); *State v. Klotter,* 274 Minn. 58, 64, 142 N.W.2d 568, 572 (1966). The testimony of this alibi witness, who stated at Marjorie Caldwell's trial that she saw appellant in the hotel in Colorado on the same night that the murders were committed in Duluth, could be material enough to meet the "probability" requirement of the *Berry* test for newly-discovered evidence. Furthermore, although appellant's counsel received a copy of the witness' statement, which then contained information unfavorable to appellant, her name did not appear on the prosecutor's list of 207 prospective witnesses. While we caution that the size of a case and the number of witnesses involved may never be used as an excuse for an inadequate investigation, we do not believe that due diligence necessarily requires defense counsel in a case of this magnitude to reinterview persons who are not listed as prospective witnesses and whose prior statements indicate that they possess no information helpful or relevant to the case. We also disagree with the State's argument that even if appellant's counsel had exercised due diligence, Ms. Byer's testimony is not newly-discovered evidence because it is "doubtful." Her testimony at Marjorie Caldwell's trial, although inconsistent with her prior statement, remained unshaken throughout cross-examination. The credibility of her testimony, in any event, is a matter for a jury to assess, taking her prior statement into consideration.[14]

The statement of Martha Caldwell regarding the coin collection was not newly-discovered evidence. The postconviction court concluded correctly that appellant's counsel's failure to interview Martha Caldwell constituted a lack of due diligence and that her statement would not have materially affected the outcome of the case.

2. We concur with the postconviction court's holding that, while the statements of the private detectives Fick and Furman should not be considered newly-discovered evidence, the prosecutor violated Minn.R.Crim.P. 9.01 subd. 1(1)(a) by failing to disclose the statements to appellant. The prosecutor's subsequent decision not to use the detectives' testimony at trial did not justify the failure to provide their statements to appellant's counsel at the outset.[15]

3. Appellant also contends that he was denied his right to a fair trial by certain prejudicial statements he alleges the prosecutor made in his closing argument and by the prosecutor's elicitation of testimony in violation of a court order. Appellant asserts that during the trial the prosecutor deliberately elicited evidence regarding certain bad checks appellant allegedly wrote, despite the trial court's ruling that such evidence was inadmissible because the prej-

---

aware that the developed nin-hydrin print on the envelope had deteriorated by the time of the trial, or that the expert retained by appellant might not have been able to make an accurate identification due to the deterioration of the original print and the possible distortion of the enlarged partial print.

14. Following oral argument in this case, the court received affidavits to the effect that Candice Byers had recanted the testimony that she gave at Marjorie Caldwell's trial. We do not here consider the effect or the validity of the alleged recantation in light of our decision to remand this matter for a new trial.

15. The court nevertheless held that under the specific request test of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the statements were not material and their nondisclosure therefore was not a denial of due process. Having already concluded that appellant is entitled to a new trial on other grounds, we need not decide this issue.

udice likely to result to appellant would be disproportionate to the comparatively minor nature of the offense involved. The court denied appellant's motions for a mistrial but offered to give cautionary instructions, which appellant's counsel later decided to waive. The prosecutor asked another witness to repeat the substance of a conversation with appellant regarding problems with appellant's bank. The witness answered that appellant had stated that he was paying off people who received bad checks with funds from a trust. The State also offered into evidence a letter the same witness had written to the Caldwells complaining about a check that had been returned twice. Appellant again moved for a mistrial. The motion was denied, but the court instructed the jury to disregard the witness' statement and ordered it stricken from the record.

In his closing argument, the prosecutor made two remarks suggesting that appellant had manufactured evidence. Following each of the comments, appellant moved for a mistrial. The court denied appellant's motions, but instructed the jury to disregard the prosecutor's remarks. Later in his argument, the prosecutor commented on appellant's "absence of activities" during the time the murders were committed. Defense counsel objected, and the court instructed the jury that appellant was not required to prove his innocence.

■ In *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974), we defined the test for prosecutorial misconduct as follows:

The test of determining whether prosecutorial misconduct was harmless depends partly upon the type of misconduct with which we are dealing. That is, the more serious the misconduct, the more certain of its effect this court has felt that it should be before labeling the error harmless. Thus, in cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming. * * * On the other hand, in cases involving less serious prosecutorial misconduct this court has

applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict.

*Id.* at 127–28, 218 N.W.2d at 200. Appellant contends that, "viewed collectively," the prosecutor's "attempts to subvert the court's order constitute prosecutorial misconduct of the highest order." The State responds that the prosecutor did not deliberately elicit statements regarding the checks, and, in fact, attempted to prevent one witness from mentioning them. The State also points out that the letter offered into evidence was received without appellant's objection. Failure of the defendant to object is a significant factor in a decision whether to order a new trial on the ground of prosecutorial misconduct. *See State v. Caron*, 300 Minn. at 127, 218 N.W.2d at 200.

■ The State argues that the alleged misconduct was harmless, although the trial court believed that the admission of statements regarding the checks was prejudicial. It is not clear that the prosecutor deliberately attempted to elicit the testimony in question; additionally, the fact that defense counsel failed to object to the offering into evidence of the letter militates against a finding of serious prosecutorial misconduct. If the misconduct is not extremely serious, the second part of the *Caron* test applies; in this case, the introduction of evidence that appellant and his wife wrote three checks while their checking account contained insufficient funds probably did not by itself play a substantial part in influencing the jury to convict appellant.

Appellant also contends that the court's corrective instructions were insufficient to overcome the prejudicial effects of the prosecutor's remarks. With respect to the propriety of the prosecutor's statement that appellant's absence would not be explained, we noted in *State v. Bell*, 294 Minn. 189, 199 N.W.2d 769 (1972), that:

While we do not believe remarks made by the prosecutor were so prejudicial as to amount to a denial of a fair trial, we do note with disapproval counsel's comment upon the failure of the defense to call witnesses to support de-

fendant's alibi. \* \* \* [W]e indicated that such argument by the prosecution, while not necessarily warranting a new trial, does not meet with the approval of this court. In this instance, the trial court's carefully worded instructions to the jury adequately prevented any prejudice to defendant from occurring as a result of counsel's indiscretion.

*Id.* at 192, 199 N.W.2d at 771 (citation omitted). In *State v. Fossen,* 282 N.W.2d 496 (Minn.1979), we stated that "[w]hether the prosecutor acted improperly in his final argument to the jury is largely a matter within the sound discretion of the trial court." *Id.* at 503 (footnote omitted). In *Fossen,* the prosecutor implied in his closing argument that the defense had tampered with certain evidence and that defense counsel had acted unethically by attempting to raise inaccurate inferences. *Id.* at 503–05. We concluded that the trial court's cautionary instructions and the effective rebuttal by defense counsel of the State's arguments prevented any improper considerations from influencing the jury's verdict. The difference in the instant case is that the prosecutor made questionable statements on three separate occasions; appellant argues that the *cumulative* effect of the repeated remarks could not be overcome by the court's instructions.

This court has held that the giving of cautionary instructions by the trial court is a significant factor favoring the denial of a motion for a mistrial. *See State v. Carlson,* 264 N.W.2d 639, 642 (Minn.1978). Although we need not decide whether the prosecutor's conduct by itself warrants reversal,[16] we are concerned with its effect on the jury in conjunction with the false fingerprint evidence. The prosecutor's remarks implying that evidence had been falsified and his comment regarding the failure of appellant to explain his absence were absolutely inappropriate and impermissible, and it is questionable whether, under the circumstances of this case, the court's cautionary instructions could have prevented the jury from reaching conclusions that were unduly prejudicial to appellant. We noted in *State v. Reardon,* 245 Minn. 509, 73 N.W.2d 192 (1955) that where "the impact of the prejudicial remark may be such as to impart to the minds of the jury substantial prejudicial evidence not properly a part of the case, it

**16.** In Vess, *Walking a Tightrope: A Survey of Limitations on the Prosecutor's Closing Argument,* 64 J.Crim.L. & Criminology 22 (1973), the following factors were listed as those appellate courts generally consider when deciding whether a prosecutor's remarks caused substantial prejudice:

First, the courts consider the strength of the evidence in the case, applying the standard harmless beyond a reasonable doubt. Thus, if the reviewing court finds overwhelming evidence of guilt, it will probably uphold the conviction, even though it may point to some improprieties which were properly preserved and before the court on review. But if the case is a close one, the court will be more likely to reverse. Some courts consider the punishment imposed in determining whether the jury was improperly influenced by the summation. Where an affirmative answer to this question appears and there is overwhelming evidence of guilt, the conviction will be sustained but the sentence will be modified.

Second, the court will consider the remarks in the context of the entire summation or a large part of it in order to determine the true extent and meaning of the disputed comments. Lengthy and repeated remarks are much more likely to result in reversal than are single or isolated references.

Third, the appellate court will consider whether the trial judge took the proper corrective action on the one hand, or further compounded the error by overruling the defense objection or by insufficiently curing the transgression, on the other.

Fourth, the court may take into account the length of the trial or the length of the argument. It may be that a misstatement in a short trial is not serious error, since the jurors should have an independent recollection of the evidence. On the other hand, a lengthy argument after a long trial is more likely to be imperfect, and minor transgressions in this setting may also be excused.

Fifth, the court may consider the atmosphere of the courtroom throughout the trial, and may be more reluctant to find reversible error where the case was "hotly contested" on both sides.

Finally, where the error in summation alone is not sufficient to require reversal, the court may then examine the cumulative effect of this impropriety in conjunction with other errors which occurred during the rest of the trial.

*Id.* at 54–55 (footnotes omitted). .

is taking too much for granted to say its effect can be removed by an instruction from the court. * * * 'The naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fiction.'" *Id.* at 513, 73 N.W.2d at 195 (quoting *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949)). We therefore view the prosecutor's conduct as a material factor in our decision to grant appellant a new trial.

▆ 4. Appellant argues, in addition, that the jury verdict form submitted to the jurors contained an improper statement of the law that prejudiced his right to be found guilty only on the basis of proof beyond a reasonable doubt. The jury had been instructed that it would be given the following verdict forms to take into the jury room:

We, the jury in the above-entitled action, find the Defendant, Roger Sipe Caldwell, not guilty; or

We, the jury in the above-entitled action, find the Defendant, Roger Sipe Caldwell, guilty of murder in the first degree.

The verdict form that the jury actually received, however, read as follows:

We, the jury impaneled and sworn to try the *guilt or innocence* of the above-named Defendant, find said Defendant, Roger Sipe Caldwell, guilty (emphasis added).

Immediately after the verdict was returned, appellant moved for a mistrial, contending that because the jury may consider whether the defendant is guilty or not guilty but not whether he is innocent, the verdict form erroneously stated the law. The State contends that appellant waived his right to challenge the verdict form on appeal because his counsel failed to examine it before it was given to the jury.

In *State v. Brouillette,* 286 N.W.2d 702 (Minn.1979), we held that the use of the very same verdict form, along with the court's statement that the function of the jury was to determine the defendant's guilt or innocence, did not justify reversal of the defendant's conviction because the defendant did not object to the alleged misstatements at the time they were made and because all of the instructions, taken as a whole, clearly did not mislead or confuse the jury regarding the presumption of innocence. *Id.* at 708–09. This case differs from *Brouillette,* however, because here the court first told the jury that the verdict forms to be used would contain the words "guilty" or "not guilty." Appellant's counsel did not examine the verdict form before the jury received it, and did not discover until after the verdict had been returned that the form actually given to the jury contained a reference to "the guilt or innocence" of appellant. We held in *Brouillette* that the defendant's failure to object to the court's misstatements of the law precluded him from raising the issue on appeal. *Id.* at 708. In this case, however, the failure of appellant's counsel to object to the verdict form seems to have been based on the reasonable assumption that the court was reading to the jury the exact verdict form that was to be used.

In *Brouillette,* we upheld the defendant's conviction in part because it was apparent that the jury was not misled regarding the proper presumption of innocence. Since the court had on two occasions correctly instructed the jury on the State's burden of proof and the presumption of innocence, we concluded that the instructions, taken as a whole, were insufficiently defective to justify reversal. In the instant case, on the morning after receiving the instructions, the jury requested a rereading of the rules on circumstantial evidence. The court reread the rules, and added the following remark:

All that the defendant has to do, is bring into your minds such a condition that when you consider all the evidence you are not able to say that he is guilty beyond a reasonable doubt; he doesn't have to prove his innocence. The State must prove him guilty by proof beyond a reasonable doubt.

Read as a whole, all of the court's instructions to the jury might have been sufficient to impress upon them the proper burden of proof and presumption of innocence. We

do not decide whether the use of the incorrect verdict form, which is unquestionably a misstatement of the law, would have been sufficient by itself to warrant a reversal of appellant's conviction; however, the cumulative effect of this instruction, the misidentified fingerprint, and the prosecutor's improper remarks, was to cause undue prejudice to appellant.

■ 5. Appellant's objection to the in-court identification of appellant as the purchaser of the garment bag at the Host Gift Shop on the grounds of the witnesses' pretrial exposure to media photographs of appellant is without merit. Appellant states that the witnesses could not have clearly observed the man in the store. However, oné of them saw him at close range while he was the only customer in the store. More important is the fact that the accuracy of the witnesses' identification and the likelihood that they were influenced by pretrial publicity are matters going to the weight to be given the identification, rather than to its admissibility. *See State v. Senske*, 291 Minn. 228, 230, 190 N.W.2d 658, 660 (1971). The jury was in a position to consider the credibility of the witnesses and to hear defense counsel challenge the accuracy of the identification during cross-examination, and was aware that the witnesses had previously seen appellant's photograph in the newspaper. Consequently, we hold that the identification was not unduly prejudicial.

6. We need not decide whether the evidence presented at trial was sufficient to sustain appellant's conviction, since we have ordered a new trial on other grounds; however, we note that on the basis of the evidence as it was presented at appellant's trial, the jury, acting in accordance with the presumption of innocence and proof beyond a reasonable doubt, could have reasonably concluded that appellant was guilty as charged. *See State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). The problem is that certain material evidence later proved to be false. Our decision that appellant should receive a new trial is based not on a conclusion that the State's evidence as the jury heard it was insufficient to sustain the verdict, but on the fact that the jury heard false testimony of a highly incriminating nature. As a result, he did not receive a fair trial. In *State v. Reardon*, 245 Minn. 509, 73 N.W.2d 192 (1955), we remarked that there was "cogent evidence to support the verdict; and it may be expected that on a second trial the result would be the same. But to allow factually strong cases to erode such a basic right is to deny the existence of the right." *Id.* at 514, 73 N.W.2d at 195. It may well be that when the appellant presents these new matters to a jury, the State's evidence will still prove sufficient to convict him, but we believe that to allow a conviction to be based even in part upon such manifestly inaccurate and prejudicial testimony as the fingerprint identification would be a serious injustice.

Reversed and remanded.

KELLEY, J., took no part in the consideration or decision of this case.

PETERSON, Justice (dissenting).

In reversing defendant's conviction for first-degree murder, the majority of the court departs from the traditional "probability" standard for determining whether newly discovered evidence warrants a new trial, adopts the *Larrison* "possibility" rule and applies the rule in circumstances where it has never before been applied by any state or federal court. I disagree with the ultimate decision to reverse defendant's conviction and the manner in which the majority arrives at its decision. The majority fails to explain why the traditional rule is inadequate in these circumstances, why it chooses to follow the *Larrison* rule or why the application of the *Larrison* rule is justified where the testimony at issue is merely erroneous rather than deliberately false. I believe that the time-honored probability standard, which has always been adhered to in Minnesota before this case, should be followed, and, for this reason, I dissent.

Under the traditional standard for determining whether newly discovered evidence warrants a new trial, the threshold inquiry

is whether the new evidence could have been discovered through the exercise of due diligence before defendant's trial. During the subsequent trial of defendant's wife, it was found that the original identification of a fingerprint as defendant's was erroneous. I have grave doubt whether the discovery that the original identification was incorrect is new evidence that could not have been discovered through the exercise of due diligence.[1] Nevertheless, I base my dissent on the ground that defendant has failed to satisfy the final inquiry under the traditional standard.

A new trial may be granted on the basis of newly discovered evidence under the traditional Minnesota standard only where the new evidence is such as will probably produce a different result on retrial. *Martin v. State*, 295 N.W.2d 76, 78 (Minn.1980); *State v. Klotter*, 274 Minn. 58, 64, 142 N.W.2d 568, 572 (1966); *State v. Weis*, 186 Minn. 342, 344, 243 N.W. 135, 135–36 (1932). As this court has stated:

> One of the controlling inquiries in determining whether a new trial should be granted on [the ground of newly discovered evidence] is whether the new evidence, if produced, will be likely to change the result; and unless it has a substantial tendency towards showing the innocence of defendants, a new trial should not be granted.

*State v. Nelson*, 91 Minn. 143, 155, 97 N.W. 652, 657 (1903).

Respected courts in other jurisdictions have held that it is "not sufficient for [the defendant] to bring in new evidence from which a jury *could* find him not guilty—it must be evidence which persuades the judge that a jury *would* find him not guilty." *Lombardo v. State*, 172 Conn. 385, 391, 374 A.2d 1065, 1068 (1977). *Accord Commonwealth v. Markham*, —— Mass.App. ——, 411 N.E.2d 494, 496 (1980). Other courts have similarly instructed that "the test to be employed is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material that it ought to produce a different result than the verdict reached." *State v. Miles*, 402 So.2d 644, 649 (La.1981). *Accord State v. Terroni*, 270 A.2d 75, 78 (Me. 1970). Justice Benjamin Cardozo, then judge of the New York Court of Appeals, considered this problem in a case where the newly discovered evidence concerned state witnesses who had recanted their trial testimony. Concurring in the judgment of the court denying a new trial, he stated that the trial court, when presented with the new trial motion, should not abandon the search for truth and turn it over to a jury. He said:

> That would have been an easy avenue of escape from a solemn responsibility, but I cannot satisfy myself that along that avenue lay the path of duty. I think it was the duty of the trial judge to try the facts, and determine as best he could where the likelihood of truth lay. * * * He was not at liberty to shift upon the shoulders of another jury his own responsibility.

*People v. Shilitano*, 218 N.Y. 161, 180, 112 N.E. 733, 739 (1916) (Cardozo, J., concurring).

The fundamental issue concerns whether a new trial should be granted on the basis of newly discovered evidence where expert witnesses for both the state and the defense mistakenly identified a fingerprint as being defendant's.[2] The resolution of that issue

1. Because the newly discovered evidence concerns physical evidence to which defendant had access before trial, I doubt whether he exercised due diligence. *See Farmer v. State*, 491 S.W.2d 133 (Tex.Cr.App.1973). In *Farmer* the defendant, convicted of forgery, sought a new trial based on the post-trial discovery by a handwriting expert that the signature on the forged instrument was not defendant's. The court found this did not constitute newly discovered evidence warranting a new trial because of a lack of due diligence. Because I find the other ground for this dissent to be more compelling, I do not express an opinion on the question whether defendant exercised due diligence by retaining an expert who may not have performed in a competent manner.

2. Defendant's fingerprint expert had access to the original fingerprint and the photographic enlargement of the original fingerprint. Although the record is unclear, this expert apparently followed one of two procedures:

turns on the strength of the state's other evidence. *O'Bryan v. State,* 300 So.2d 323 (Fla.App.1974), provides an apt analogy to this case. In *O'Bryan* the defendant was charged with murder. At trial the state introduced evidence that the defendant had type "A" blood, that the decedent had type "O" blood, that blood samples taken from fingernail scrapings of the decedent's hands revealed the presence of both type "O" and type "A" blood, and that tests made on bloodstains on the tip of a vaginal swab used on the decedent revealed the presence of both type "O" and type "A" blood. The defendant was convicted of first-degree murder. After trial, it was found that the defendant had type "O" blood. The court found there was no lack of due diligence by the defense counsel in failing to discover this evidence. Nevertheless, the court denied the motion for a new trial based on newly discovered evidence. The court said that in view of the overwhelming evidence of the defendant's guilt, it could not conclude that the newly discovered evidence— the erroneous identification of physical evidence directly linking the defendant to the crime—was such as would probably change the result if a new trial were granted.

The overwhelming likelihood of truth in this case is that defendant was properly found guilty of first-degree murder. The fingerprint on the envelope containing the gold coin is not, as the majority asserts, "the only circumstantial evidence tending to establish that [defendant] was in Duluth on the date of the murders." (*Supra* at 587). The state's handwriting expert testified that the handwriting on the envelope was that of defendant. As the majority notes, this court must take the view most favorable to the state and must assume that the jury believed the state's witness and disbelieved any contrary evidence. (*Supra* at 586). Beyond this physical evidence placing defendant in Duluth at the time of the murder, there was a significant amount of other incriminating evidence against defendant. Defendant had an undisputably strong motive for murdering Elisabeth Congdon; witnesses positively identified defendant as the man who was in a gift shop at Minneapolis-St. Paul International Airport the morning of the murder; the gold coin in the envelope addressed to defendant in defendant's handwriting was taken from Elisabeth Congdon's bedroom; and jewelry missing from Elisabeth Congdon's body was found in defendant's hotel room. Still other evidence further implicated defendant: hair and blood found near the dead bodies were similar to defendant's hair and blood type; the day after the murder defendant had cuts on his face and a swollen hand; the day after the murder defendant opened a safe deposit box and placed in it a document signed by his wife in which she conveyed to defendant all of the money due her from a trust upon the death of Elisabeth Congdon; and a wicker basket similar to one missing from Elisabeth Congdon's bedroom was found in de-

(a) *He relied exclusively on the original fingerprint* and, like the state's expert witness, made an erroneous identification. That is, it may be that the original print had not deteriorated to the point where defendant's expert thought it could not be the basis for an accurate identification. Under these circumstances, the expert would have come to the same erroneous conclusion even if he had access to the photographic negative; or

(b) *He was aware of the deterioration and relied exclusively on the enlargement* in making his erroneous identification. Under these circumstances, it is inexplicable why the expert would not have informed defendant's attorney that he could not make an accurate identification due to the deterioration of the original print and the possible distortion of the enlargement. We do not know why he would not have requested the negative if he was not able to make an accurate identification based on the original print. Common sense dictates that the enlargement could only be produced from a negative.

Thus, it appears that the defense expert had sufficient information either to make an accurate identification or to conclude that no accurate identification could be made. The fact of deterioration, although the reason the mistaken identification was later discovered by a defense expert in the subsequent trial of defendant's wife, only serves to obfuscate the issue raised by this case. This issue would be no different if no deterioration had occurred or if the defense had access to the negative before the trial and the defense expert still made an erroneous identification.

fendant's hotel room. In the face of this staggering array of evidence, I am unable to conclude that a jury in a new trial probably would, much less ought, find defendant not guilty.

The majority's sole basis for reversing defendant's conviction is the erroneous fingerprint identification by the state expert. For this reason, the majority's reference to the alibi testimony of Candice Byers is curious. Ms. Byers, who did not testify at defendant's trial, stated at Marjorie Caldwell's trial that she saw defendant in a Colorado hotel at about 10 p. m. on June 26, 1977, the night the murders were committed in Duluth. However, on July 1, 1977, Ms. Byers told the Colorado police that she did not recall seeing defendant on June 26, and on July 9 she gave the police a written statement to the same effect. Moreover, following oral argument in this case, the state submitted affidavits and a handwritten statement by Ms. Byers stating that she had testified untruthfully at Marjorie Caldwell's trial. Under these circumstances, and in light of the other evidence which the majority concedes is sufficient to sustain defendant's conviction (*supra* at 592), I find it implausible to believe that Ms. Byer's testimony is sufficiently material to meet the traditional probability test for newly discovered evidence. The majority's ambiguous assertion that her testimony "could" be material enough to meet this test (*supra* at 588) is makeweight, and belies the actual ground upon which the conviction is being reversed.

The majority expresses no disagreement with the conclusion that defendant's conviction should not be reversed under the probability standard on the basis of the erroneous fingerprint evidence but determines that it should be reversed under the *Larrison* possibility standard. I disagree with the application of this less stringent standard for the following reasons:

First, there are no cogent reasons for discarding our time-tested probability standard. Neither federal nor state constitutional law requires the possibility standard;[3] no Minnesota statute mandates it; and Minnesota common law has always adhered to the probability standard.[4] Due regard

**3.** The majority opinion states that the use of the fingerprint evidence denied appellant his right to a fair trial (*supra* at 586, 592) and cites *State v. Reardon*, 245 Minn. 509, 73 N.W.2d 192 (1955), for the proposition that a conviction may be reversed if a defendant's right to a fair trial is denied even if there is cogent evidence to support the conviction. (*Supra* at 592.) In *Reardon*, the court reversed a conviction on state and federal due process grounds.

Despite this language in the majority opinion and the citation to *Reardon*, the majority is not reversing defendant's conviction on due process grounds. (*Supra* at 586 n.9.) Indeed, the general rule is that a state defendant's federal constitutional rights are violated only where he is convicted upon false or perjured testimony and the state knowingly or intentionally used such testimony. *See, e.g., United States ex rel. Burnett v. Ill.*, 619 F.2d 668, 674 (7th Cir.), *cert. denied*, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980); *Burks v. Egeler*, 512 F.2d 221, 226–29 (6th Cir.), *cert. denied*, 423 U.S. 937, 96 S.Ct. 297, 46 L.Ed.2d 270 (1975); *Lister v. McLeod*, 240 F.2d 16, 17 (10th Cir. 1957). The majority finds no misconduct on the part of the prosecutor concerning the fingerprint evidence, and therefore there is no federal constitutional law violation. Also, defendant has never asserted, and the majority does not intimate, that the

state constitution provides greater due process safeguards under these circumstances than the federal constitution mandates; therefore there is also no state constitutional law violation.

**4.** This court has traditionally followed the "probability" test for determining whether newly discovered evidence warrants a new trial. *See, e.g., Martin v. State*, 295 N.W.2d 76, 78 (Minn.1980); *State v. Klotter*, 274 Minn. 58, 64, 142 N.W.2d 568, 572 (1966); *State v. Weis*, 186 Minn. 342, 344, 243 N.W. 135, 135–36 (1932).

This case concerns a state expert who erroneously identified a fingerprint as defendant's; there are no grounds for believing that the expert deliberately lied. In past Minnesota cases where it was discovered after the trial that a key prosecution witness mistakenly or erroneously testified, this court has followed the "probability" rule. *See, e.g., State v. Meldahl*, 310 Minn. 136, 245 N.W.2d 252 (1976); *State v. Warren*, 252 Minn. 261, 89 N.W.2d 702 (1958).

In *State v. Hill*, 312 Minn. 514, 253 N.W.2d 378 (1977), and *Whelan v. State*, 298 Minn. 545, 214 N.W.2d 344 (1974), a variation of the *Larrison* rule was applied in the case of recanted testimony solely to support the proposition that, as a preliminary matter, the court must be reasonably convinced that the witness has in-

for the binding force of our past decisions does not require a blind adherence to precedent but it does impose an obligation to forthrightly explain departures from our common law. The majority inexplicably treats the case as one of first impression and fails to explain why the traditional probability standard is inadequate for determining whether the discovery of erroneous testimony warrants a new trial.[5]

Second, the *Larrison* rule has severe deficiencies. As one court reasons:

[The *Larrison*] test, if literally applied, should require reversal in cases of perjury with respect to even minor matters, especially in light of the standard jury instruction that upon finding that a witness had deliberately proffered false testimony in part, the jury may disregard his entire testimony. Thus, once it is shown that a material witness had intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, "might" have acquitted. We recognize that those who have professed adherence to the *Larrison* test do not appear to share our concern over the problems arising from its speculative nature. Indeed, notwithstanding the looseness of the test, most courts have not hesitated to deny new trials in cases where they have purported to apply it. However, rather than adopt the *Larrison* test and violate it in application, we believe, for the reasons indicated, that the

time-honored "probability" standard is the more appropriate one for determining whether perjury calls for a new trial. In addition to its other virtues the rule enables a court to act forthrightly in making its determination.

*United States v. Stofsky*, 527 F.2d 237, 245–46 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976) (footnote omitted). Another court, noting that the *Larrison* rule creates an arbitrary distinction between perjured testimony and other new evidence, states:

One may always ask how courts can be certain that new evidence would not create a reasonable doubt in the mind of at least one juror. Yet, we have always required a showing that the new evidence would "probably" result in an acquittal upon a new trial. We are not convinced that all cases involving some perjured testimony *necessarily* require new trials. Yet, as the court in *United States v. Stofsky* * * * observed, this is exactly where the logic of such cases as *Larrison* * * * leads.

*United States v. Krasny*, 607 F.2d 840, 844 (9th Cir. 1979), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980).

The majority posits two reasons for treating false testimony differently from other newly discovered evidence. The majority first argues that a higher standard of mate-

---

deed recanted. In both cases the court was not so convinced and thus the question whether the probability test or the possibility test was appropriate was not at issue and was not expressly considered. Indeed, *State v. Klotter*, 274 Minn. 58, 142 N.W.2d 568 (1966), which follows the "probability" test, is cited in both cases as authority for the variation of the *Larrison* rule.

5. The majority's decision to grant a new trial based in part on the court's supervisory power (*supra* at 586 n.9) is unnecessary and inappropriate. It is unnecessary because the court has already based its decision on the *Larrison* rule. It is inappropriate because this court's supervisory power is properly invoked only where the procedures followed in reaching the adjudication below are amenable to improvement. *Cf. State ex rel. Doe v. Madonna*, 295 N.W.2d 356, 365 n.17 (Minn.1980) (preliminary probable cause hearing for person subjected to prehear-

ing confinement in mental institution authorized pursuant to court's inherent supervisory powers); *Hepfel v. Bashaw*, 279 N.W.2d 342, 348 (Minn.1979) (counsel for indigent defendants in paternity adjudications mandated pursuant to court's supervisory power when complainant is represented by county attorney). In this case, experts for both the state and the defense erroneously tested physical evidence. There are no procedures which can be implemented to prevent the recurrence of this type of problem in future cases, and thus the asserted exercise of the court's supervisory power in this context is inappropriate. The majority utilizes the court's supervisory power not to create new procedural safeguards but rather to implement their notion of the proper substantive law. The court has never used this power in this manner before.

riality is necessary in the case of ordinary newly discovered evidence "because this new evidence has not been tried. The trial court is thus required to anticipate the effect on a second trial of evidence of unknown reliability." (*Supra* at 585). The majority further argues that a lesser standard of materiality is appropriate for false testimony because "the court has already been able to make a determination that the testimony actually was false; thus the matter of credibility, as it concerns a *second* trial, is less important." (*Supra* at 585).

This first argument confuses reliability with materiality and, in any event, fails to justify the use of different standards of materiality. It is not true that, in the case of false testimony, the court has already made a determination that the testimony was actually false. The determination that ordinary newly discovered evidence is reliable, or that testimony presented at the first trial is false, is made at the same time—during the post-trial proceedings. Thus, ordinary newly discovered evidence and the discovery that testimony is false may not be legitimately distinguished on the basis of their inherent reliability, as the majority appears to suggest.

I assume that the majority is attempting to articulate a distinction grounded on the trial court's ability to determine the materiality of the evidence. Apparently, the majority is asserting that a trial court is better able to judge the impact that the absence of certain testimony will have at a second trial, than to judge the impact the addition of new material will have at a second trial.

Even granting the validity of such an assertion, it does not support the use of different standards of materiality based on the source of the evidence. Indeed, common sense dictates that a lower standard should apply, if at all, when the trial court is less certain about the materiality of the evidence, *i.e.*, when ordinary newly discovered evidence is at issue.

The majority's other argument, based on *United States v. Johnson*, 149 F.2d 31 (7th Cir. 1945), *rev'd on other grounds*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946), is that, while most new trial motions concern the probable effect of newly discovered evidence on a future trial, new trial motions based upon perjury concern the probable effect of the perjured testimony on the first trial. The court in *United States v. Krasny*, 607 F.2d at 844, responded to this argument as follows:

> We cannot see any practical difference in this distinction. * * * [*Johnson*] does not suggest any effective difference between perjured testimony and other new evidence, and we can conceive of none. The focus of the inquiry is on what difference the evidence would have made to the trial, regardless of its source.

Third, the majority is applying the *Larrison* rule in circumstances where it has never before been applied by any state or federal court. The *Larrison* rule has been applied to perjured or deliberately false testimony but never to merely mistaken or erroneous testimony, much less to the good faith albeit mistaken interpretation of physical evidence by an expert.[6]

**6.** The majority's claim, that the *Larrison* court relied on a statement in *Martin v. United States*, 17 F.2d 973 (5th Cir.), *cert. denied*, 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927), concerning mistaken testimony (*supra* at 586), is disingenuous. In *Martin* the defendant moved for a new trial on the ground that a state witness had confessed to perjury. The *Martin* court's comment concerning mistaken testimony was mere dictum. *Ledet v. United States*, 297 F.2d 737, 739 (5th Cir. 1962). In *Larrison* the defendant sought a new trial based on the alleged perjury of a state witness. The *Larrison* court did not rely on the *Martin* dictum concerning mistaken testimony; rather, the court cited *Martin* only for the proposition

that courts should not necessarily deny new trial motions "when the *perjured* testimony is merely cumulative." *Larrison v. United States*, 24 F.2d 82, 87 (7th Cir. 1928) (emphasis added). The proper standard for determining new trial motions based on mistaken rather than perjured testimony was simply not at issue either in *Larrison* or *Martin*.

The majority's citation of two cases as direct support for the *Martin* dictum concerning mistaken testimony is curious. In *La Fever, Inc. v. All-Star Ins. Corp.*, 571 F.2d 1367 (5th Cir. 1978), a plaintiff in a civil case sought a new trial based on the asserted perjury of a witness. In *United States v. McBride*, 463 F.2d 44 (5th Cir.), *cert. denied*, 409 U.S. 1027, 93 S.Ct. 475,

The state's expert erroneously identified a fingerprint as defendant's. There is no indication that the expert intentionally falsified his testimony. However, false testimony under the *Larrison* rule means "deliberately false or 'false swearing.'" *United States v. Strauss*, 443 F.2d 986, 989–90 (1st Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). *See United States v. Johnson*, 142 F.2d 588, 592 (7th Cir. 1944), *rev'd on other grounds*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 567 (1946). In *United States v. Munchak*, 338 F.Supp. 1283 (S.D. N.Y.), *aff'd*, 460 F.2d 1407 (2d Cir.), *cert. denied*, 409 U.S. 915, 93 S.Ct. 236, 34 L.Ed.2d 177 (1972), the court discussed this precise issue, reasoning:

> The determination of this issue—whether [the government witness'] answer was erroneous but inadvertent, or intentional and perjurious—gives direction to the standard to be applied in the motion for a new trial. * * *
>
> *       *       *       *       *       *
>
> * * * The standard of materiality which must be satisfied to obtain a new trial on the basis of newly discovered evidence varies with the circumstances under which the defendant was deprived of knowledge of the existence of such evidence. Here, since there was no perjury, and since there is no charge of prosecutorial misconduct, nor any support for such a charge with respect to these tests, the defendant must show that knowledge and use of them "would probably produce a different verdict."

*Id.* at 1289–91 (footnotes omitted).

The majority does not dispute that the *Larrison* rule has never before been applied in the context of merely erroneous testimony, but states that "we do not believe that the witness' state of mind necessarily should be the factor that determines whether a defendant is entitled to a new trial." (*Supra* at 587). This language obfuscates the real issue, which is whether the witness' state of mind should be the factor that determines the proper *standard* to be applied in the motion for a new trial. The probability standard has always been applied in Minnesota cases where it was discovered after trial that a state witness had erroneously testified. *See, e.g., State v. Meldahl*, 310 Minn. 136, 245 N.W.2d 252 (1976); *State v. Warren*, 252 Minn. 261, 89 N.W.2d 702 (1958). In any event, the ramifications of the majority's reasoning are limitless. If there is no distinction between perjured testimony and merely erroneous testimony, why treat any new evidence in a different manner? Why not completely abandon the probability standard and apply the *Larrison* rule for all new evidence? If the witness' state of mind is an illegitimate or irrelevant factor in determining entitlement to a new trial (or in determining the standard to be applied in the new trial motion), certainly the source of the evidence is an illegitimate or irrelevant factor for the same reasons. The majority leaves us with no principled basis for distinguishing in future cases between perjured or erroneous testimony, which it now proposes are to be treated identically, and all other new evidence for the purpose of determining whether such evidence warrants a new trial.

Finally, even if the *Larrison* rule is the governing standard under these circumstances, defendant's conviction should not be reversed. Under the *Larrison* rule, an admission of false testimony does not warrant a new trial, if, eliminating such evidence, there is still other evidence sufficient to support the judgment. *Larrison*, 24 F.2d at 87; *State v. Compiano*, 261 Iowa 509, 518, 154 N.W.2d 845, 850 (1967). *See* 4 F. Wharton, Criminal Procedure § 601 at 189 (C. Torcia 12th ed. 1976); 58 Am.Jur.2d *New Trial* § 175 at 391 (1971); 24 C.J.S. *Criminal Law* § 1454k at 189 (1961). The majority concedes that there is sufficient

---

34 L.Ed.2d 320 (1972), a criminal defendant moved for a new trial on the ground that a material government witness had admitted to perjury. Thus, none of the four cases cited by the majority to support the proposition that a

lesser standard of materiality is appropriate where the witness' testimony is merely erroneous involved a new trial motion based on merely erroneous testimony.

evidence to sustain defendant's conviction. (*Supra* at 592). Defendant's conviction should therefore be affirmed.

YETKA, Justice.

I join in the dissent of Mr. Justice PETERSON.